{¶ 10} 2006–0564. *State v. Ladson*, 165 Ohio App.3d 590, 2006-Ohio-451, 847 N.E.2d 491.

THE STATE OF OHIO, APPELLEE, *v.* ROBERTS, APPELLANT.

[Cite as *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665.]

(No. 2003–1441—Submitted January 24, 2006—Decided August 2, 2006.)

O'CONNOR, J.

{¶ 1} At 12:01 a.m., December 12, 2001, the appellant, Donna M. Roberts, phoned 911 to report the death of her former husband, Robert Fingerhut, at the home they shared in Howland Township, Trumbull County, Ohio. After investigating, the police learned that Roberts and Nathaniel Jackson had plotted to kill Fingerhut while Jackson was in prison in the months preceding the murder. Subsequently, the pair were arrested and indicted.

{¶ 2} Jackson was convicted of the aggravated murder of Fingerhut and was sentenced to death, a conviction and sentence that we have affirmed. See *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362. In a separate trial, Roberts was found guilty of the aggravated murder of Fingerhut and was also sentenced to death.

{¶ 3} Roberts now appeals, raising an array of challenges to her conviction and sentence. Although we reject all of Roberts's attacks on her conviction, because of the trial judge's ex parte use of the prosecutor in directly preparing the court's sentencing opinion, we must vacate the sentence and remand the case to the trial court for resentencing.

## RELEVANT BACKGROUND

{¶ 4} The facts taken in the light favorable to the state establish the following facts.

{¶ 5} Donna Roberts met Robert Fingerhut in Florida in 1983; they married, but were divorced soon thereafter. According to Roberts, the divorce was for financial and business reasons—i.e., that Fingerhut wanted to shelter and protect assets in case his business was sued or collapsed.

{¶ 6} The couple moved to Ohio and established a home on Fonderlac Drive in Howland Township, Warren, Ohio. Fingerhut bought two Greyhound bus terminals—one in Warren and one in Youngstown—and began operating them. Those assets and almost all others were listed in Roberts's name.

{¶ 7} Despite the divorce, Fingerhut appears to have continued to treat Roberts as his wife, referring to her as such in many of his business dealings. Most people who dealt with Roberts and Fingerhut assumed that they were married. Roberts similarly maintains that, in her mind, she did not consider herself divorced because she and Fingerhut were a devout, loving couple.

{¶ 8} Notwithstanding her feelings for Fingerhut, at some point during that relationship, Roberts met Nathaniel Jackson and began an affair with him. The liaison was interrupted in 2001, when Jackson was incarcerated in the Lorain Correctional Institution. Upon his release, however, they were reunited.

{¶ 9} On December 6, 2001, Roberts reserved and paid for a Jacuzzi suite in Jackson's name at the Wagon Wheel Motel in Boardman. Three days later, Jackson and Roberts spent the night in that room.

{¶ 10} Over the next several days, the pair were seen together at various places. A day or two before Fingerhut's death, Frank Reynolds, then an employee of the Greyhound bus terminal in Youngstown, saw Roberts and Jackson kissing and talking with one another near the terminal before Fingerhut arrived for work. Earlier, Reynolds had overheard Roberts asking Fingerhut for $3,000. Fingerhut had refused. According to Reynolds, Roberts was nervous and shaking and gave Fingerhut "the dirtiest look."

{¶ 11} On December 11, 2001, Greyhound bus driver Jim McCoy saw Fingerhut working at the Youngstown terminal at approximately 4:30 p.m. Fingerhut was the only person working that afternoon.

{¶ 12} Soon after seeing Fingerhut in the terminal, McCoy drove his bus to Warren. He saw Roberts and Jackson at the Warren terminal, and Jackson told McCoy, "[W]e're trying to get out of here." On December 11, a server at the Red Lobster restaurant in Niles waited on a couple she later identified as

Roberts and Jackson. The two paid for their dinner at 6:43 p.m. and left the restaurant.

{¶ 13} Fingerhut left the Youngstown bus terminal around 9:00 p.m. on December 11, telling the security guard on duty that he was leaving early for the evening. Around 9:30 p.m., a neighbor observed Roberts driving her car very slowly on Old State Route 82 near their homes, even though no one else was on the road at the time.

{¶ 14} Later that night, Roberts went to the Days Inn in Boardman to reserve a room for the following week. She was alone and paced around the lobby. The room receipt indicates that she paid for the room at 11:33 p.m.

{¶ 15} At 12:01 a.m., December 12, 2001, Trumbull County authorities received a 911 call from Roberts, who was screaming hysterically that there was something wrong with her husband. Upon arriving at the home, police found Fingerhut's body on the kitchen floor near the door to the garage.

{¶ 16} A Trumbull County forensic pathologist, Dr. Humphrey Germaniuk, observed Fingerhut's body at the crime scene and later performed an autopsy. Fingerhut had sustained lacerations and abrasions to his left hand and head, as well as multiple gunshot wounds to his head, chest, and back. Dr. Germaniuk concluded that the gunshot to Fingerhut's head was the cause of death.

{¶ 17} During the crime-scene search, police found a fully loaded .38–caliber revolver near Fingerhut's body. A firearms expert with the Bureau of Criminal Identification and Investigation ("BCI") later concluded that the bullets recovered from the home and Fingerhut's body were fired from the same weapon, either a .38–caliber special or a .357 Magnum, but that none of the bullets had been fired from the revolver found near Fingerhut's body.

{¶ 18} During the hours immediately following Roberts's 911 call, police observed that her emotional state fluctuated. At times, she was calm and quiet, and at other times she was crying or screaming, "Oh, my Robert, my Robert." Two detectives noticed that when police investigators talked extensively, they no longer heard Roberts shouting. When a detective checked on Roberts in her bedroom because she had been quiet, she began shouting again upon seeing him. One officer at the scene remarked that he "didn't notice any tears coming from [Roberts's] eyes" when she appeared to be crying.

{¶ 19} In this period of initial investigation, Roberts told police that she had left work at the Greyhound bus terminal in Warren at 5:30 that evening, had dined alone at a Red Lobster restaurant, and had then gone home. According to Roberts, Fingerhut called her and said he would be late coming home and suggested that she go shopping. Roberts said she had left her home at 9:00 p.m. and had gone to several stores. When she returned home shortly before

midnight, she found Fingerhut lying on the floor, bleeding from the face. She also stated that her husband's car was not at the house.

{¶ 20} Eventually, police arranged for Roberts's brother to pick her up while they continued to secure the scene and collect evidence. Before Roberts left the house, Detective Sergeant Paul Monroe told Roberts that the house was a crime scene and that police needed to search the house and everything in it, including the garage and cars. Roberts allegedly replied, "Do whatever you have to do to catch the bastard."

{¶ 21} At 3:38 a.m. that morning, police were still at the house investigating. The phone rang, and Detective Sergeant Monroe answered it. There was a pause, and then the caller hung up. Detective Monroe traced the call to Roberts's cell phone.

{¶ 22} Around 10:00 a.m. that morning, Detective Monroe visited Roberts at her brother's home. At that time, Roberts gave police written consent to continue searching the residence.

{¶ 23} Later, on the afternoon of December 12, Roberts met with Sergeant Frank Dillon and Detective Sergeant Monroe at the police station. Roberts described her "loving relationship" with Fingerhut but also stated that she and Fingerhut were a "cool couple" and that he "did his thing, she did hers."

{¶ 24} She described Fingerhut as "go[ing] both ways" and said that he had a friend named "Bobby." She recalled that about a week and a half before the murder, Fingerhut was acting kind of "nutty," and she had thought the behavior was because of his relationship with Bobby.

{¶ 25} Roberts also stated that she had been having a sexual relationship with a man named Carlos for six months. She additionally indicated that she had a friend named Santiago whom she had tried to help, but that he had stolen money and a gun from her. When Detective Monroe asked Roberts whether she had relationships with anyone else, Roberts replied, "No, there's nobody else. I told you everybody."

{¶ 26} Monroe then asked her about a man named Nate Jackson, and Roberts said, "Yes, I forgot about him." Roberts admitted that she had been dating Jackson for two years and that he had called her from prison and had exchanged letters with her. Roberts claimed that she had last seen Jackson on December 9, when she picked him up at Lorain Correctional Institution and had then left him in Youngstown at a house on Wirt Street. Roberts added that she had last spoken to Jackson over the telephone rather than in person on the morning of December 11.

{¶ 27} Detective Monroe asked Roberts whether she had a cell phone and whether he could look at it. Roberts searched her purse and said that she had

left it at home. Monroe then told Roberts that a call originating from her cell phone had been placed to the crime scene at 3:38 that morning. Roberts said, "Nate must have had the phone. He's always borrowing it."

{¶ 28} In the ensuing week and a half, police continued to investigate and learned that Jackson and Roberts had spent a night together at the Wagon Wheel Motel and that Roberts had registered at the Days Inn and had paid for one week's rental.

{¶ 29} Police and a BCI agent located and retrieved evidence, including Jackson's fingerprints, from the room at the Days Inn in which Jackson had stayed. Police also recovered a garbage bag in a dumpster at the motel that had come from Jackson's room. That bag contained a bottle of peroxide, used bandages, and gauze with blood that was consistent with Jackson's DNA profile.

{¶ 30} Police learned that Fingerhut had taken out two life insurance policies on his life, naming Roberts as sole beneficiary. The aggregate benefit of the policies amounted to $550,000.

{¶ 31} On December 12, police found Fingerhut's abandoned vehicle in Youngstown, approximately three blocks from Wirt Street. A forensic specialist found blood on the driver's side visor and on other areas inside the automobile. Subsequent scientific analysis determined that blood on the visor contained a mixture consistent with both Jackson's and Fingerhut's DNA profiles. Blood recovered from the trunk release inside the car contained a DNA mixture with a major profile that was consistent with Jackson's DNA and a minor profile consistent with Fingerhut's DNA. The frequency for Jackson's DNA on the trunk release was one in 45 quintillion, 170 quadrillion in the Caucasian population, and one in 29 quadrillion, 860 trillion in the African–American population. Jackson is African–American.

{¶ 32} Cell-phone records indicated that a number of phone calls were made on December 11 between 9:45 p.m. and 11:44 p.m. from the cell phone that Roberts said Jackson had borrowed from her and a cell phone located in Roberts's vehicle.

{¶ 33} Additional evidence implicated Roberts and Jackson in the murder. As noted previously, Roberts had admitted to police that she and Jackson had exchanged letters and telephone calls during his incarceration. During their initial search of the home, police discovered more than 140 letters and cards written by Jackson to Roberts, most of which were addressed to Roberts at a post office box in Warren.

{¶ 34} Police also found a brown paper bag with Jackson's name on it in the trunk of Roberts's car, which had been parked in the garage at their residence. The bag contained clothing and approximately 140 handwritten letters, dated between October and December 2001, sent by Roberts to Jackson.

{¶ 35} Passages from letters exchanged between Jackson and Roberts suggested strongly that there had been a plot to murder Fingerhut. Many of the letters described the couple's physical relationship and plans for Jackson's release, as well as references to how they would deal with Fingerhut once Jackson was out of prison.

{¶ 36} For example, in a letter from early October 2001, Jackson wrote Roberts:[1] "[W]hy don't you leave Robert an lets carry on with a world of our own? Or let me do what I was gonna do to him, because you know that—that was our little thing so you better not go an try to get know one else to do it, because I told you its getting done when I come home * * *." Less than a week later, Jackson wrote Roberts: "Donna I got it already planned out on how we are gonna take care of the Robert situation? An baby its the best plan ever! Because Donna its now time that we really be together so that we can really see the true side of our love because I'm tired of not being able to be with you * * *."

{¶ 37} Soon thereafter, Jackson again expressed his desire to be with Roberts and to be rid of Fingerhut: "Donna I don't care what you say but Robert has to go! An I'm not gonna let you stop me this time. An Donna you know that I've always wanted to live my life with you an only you but everytime that I wanted to take care of the situation by myself you wouldn't never let me. * * * Because you wouldn't let me do what I wanted to do to make you happy an that was get rid of him! So Donna can I do this so that we can go on an live happy? An then maybe we can sell the house an move on to somewhere else in our own world. An I'm not gonna be happy until that happens!"

{¶ 38} Roberts responded to Jackson with her own letters. In one from mid-October 2001, she indicated her frustration over limits that Fingerhut apparently had imposed on her spending and her apparent agreement to Jackson's plan for Fingerhut's murder. She wrote, "You know you can always count on me—you always could. It'll just be a little tougher now because he gives me $100 a week for everything and then makes me write checks to keep track of it all. And I haven't been ALLOWED to use any of my 52 charge cards—emergency only. I am not used to living like this. I am used to having plenty of cash for whatever I want & buying everything I want. Maybe those days will return again soon. Do whatever you want to him ASAP. Amen." Jackson replied, "An then after that you don't ever have to worry about making know more excuses to him, because he will no longer be with us after 12–10–01 an then it'll be me an you totally an completely * * *." Within that same passage, Jackson drew a tombstone with the inscription, "Rest In Piss," before continuing, "Hey Donna just think come

---

1. The words used in Jackson's letters are presented verbatim.

12–11–01 you'll be waking up to me or maybe we'll give it a couple of days to let things look cool an then after the funeral baby when I come home I'm never leaving an we're only doing it like that just to make it look good * * *. Alls I need is for my baby not to worry an leave everything else up to me."

{¶ 39} Jackson's subsequent letters further evinced the developing plan to deal with "the Robert problem." Jackson wrote, "Yes I'm taking care of that the next night, because I told you I'm tired of living like this when I don't have to. An after that will you get me a 2002 Cadillac Deville?" In that same letter, Jackson wrote: "An even if I gotta come to the house and shoot Robert in his fucking head you're gonna be with me."

{¶ 40} The letters also indicate a role for Roberts in the scheme. An October letter from Jackson reads, "Well I see now you know that I'm about my business when I get out as far as our little situation? An get me a size large leather gloves an see if you can find me a ski mask hat okay? An I need them handcuffs you have an its mandatory, so get them for me, because the way that I'm gonna do it is gonna be right okay?" About two weeks before the murder, Roberts wrote to Jackson: "I also went to 4 stores and finally found your ski mask & boxers & a pair of beautiful fleeced lined black leather gloves."

{¶ 41} Though the words written in those letters were significant evidence of the planning of the murder, the state also marshaled the actual words spoken between Roberts and Jackson.

{¶ 42} Prison authorities at Lorain Correctional Institute routinely record telephone conversations of prisoners and maintain the recordings for at least six months. Eighteen phone calls between Roberts and Jackson were recorded electronically. Those recordings also reflect the plot to murder.

{¶ 43} For example, in a recorded conversation between Jackson and Roberts on October 25, 2001, the following colloquy took place:

{¶ 44} "[JACKSON]: I'll be home to you. December 9th all the worries will be over baby.

{¶ 45} " * * *

{¶ 46} "[JACKSON]: The next day out, I'm goin to—I already got it in my mind, my mind made up. I'm goin to go ahead and do that the next day, okay. All right.

{¶ 47} "[ROBERTS]: Oh, I just wrote to you that I didn't think that you really meant it.

{¶ 48} "[JACKSON]: What. My mind is made up. My mind made—I wrote it in my letters, you know what I'm saying, but you know, I don't like to talk too much like that but when I come home, you know what I mean, it's goin to be in

full detail. Okay. I'm goin to let you know how I'm goin to do it and everything. I'm goin to do it for sure the next day."

{¶ 49} In recorded phone conversations between Jackson and Roberts during November 2001, they continued to discuss what Jackson planned to do to Fingerhut. In a conversation on November 8, 2001, Jackson told Roberts that he wanted Fingerhut to see Roberts performing oral sex on Jackson before Fingerhut "goes away."

{¶ 50} Two weeks later, Roberts worried about Jackson's being apprehended for the murder of Fingerhut:

{¶ 51} "[JACKSON]: You know what I'm saying, the next day after. You know what I told you I wanted to do right?

{¶ 52} "[ROBERTS]: I'm afraid Nate.

{¶ 53} "[JACKSON]: What you, man.

{¶ 54} "[ROBERTS]: I can't afford to lose you. * * * I can not lose you. Like I will kill myself.

{¶ 55} " * * *

{¶ 56} "[JACKSON]: Just forget about it man, * * * when a person, man, know what he's doing, man, * * * that's like jinxing, man. * * *

{¶ 57} "[ROBERTS]: But what was the story with the trunk and handcuffs, that's too involved.

{¶ 58} "[JACKSON]: Just, just, just leave it alone, alright.

{¶ 59} "[ROBERTS]: It's too much involved. Your gonna leave hair, your gonna leave prints, your gonna,

{¶ 60} "[JACKSON]: Leave it alone, man. Leave it alone, alright. * * * Come on man. This ain't Perry Mason man.

{¶ 61} "[ROBERTS]: I don't want to know anything about it ever."

{¶ 62} On November 24, Jackson tried to reassure Roberts about his plan.

{¶ 63} "[JACKSON]: Man, we gonna * * * really talk when I come home, ok.

{¶ 64} "[ROBERTS]: OK.

{¶ 65} "[JACKSON]: Especially about our, that situation, man. You know.

{¶ 66} "[ROBERTS]: Yeah.

{¶ 67} "[JACKSON]: I mean, it just, you know, you get too nervous at times, that's all the deal is.

{¶ 68} "[ROBERTS]: Yeah I know, it part of my nature.

{¶ 69} "[JACKSON]: And then you said DNA, the only way they can do a DNA is if they got the other, the person's, you know what I'm saying. If they

got the person and the hair cause they can't just take no hair and say this is such and such hair. * * * [T]he laws that we got in the State of Ohio and the laws from everywhere else, * * * I mean they way different. * * *

{¶ 70} "[ROBERTS]: Really.

{¶ 71} "[JACKSON]: Hell yeah. We'll, we'll talk about it when I come home Donna. Ok, I don't want to talk about it over the phone."

{¶ 72} Around Thanksgiving 2001, Roberts and Jackson discussed DNA evidence, a "big 38" firearm, their reunification on the night after his release from prison and his stay in a hotel the week thereafter, and Roberts's complete reliance on Jackson.

{¶ 73} On December 8, the day before Jackson was released from prison, Jackson and Roberts had one final recorded conversation. Roberts expressed misgivings about what Jackson was planning to do to Fingerhut, but Jackson told her, "I got to do this Donna. I got to." Roberts told Jackson that she did not want to know about it. The following colloquy then took place:

{¶ 74} "[JACKSON]: Just consider it a done deal. Only thing I'm gonna need is one thing.

{¶ 75} "[ROBERTS]: What?

{¶ 76} " * * *

{¶ 77} "[JACKSON]: I just need to be in that house when he come home.

{¶ 78} "[ROBERTS]: Oh no.

{¶ 79} " * * *

{¶ 80} "[JACKSON]: Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you.

{¶ 81} " * * *

{¶ 82} "[JACKSON]: I just need to be in there man. It ain't gonna happen in the house man. I mean I ain't gonna jeopardize that man.

{¶ 83} "[ROBERTS]: Well, let's not talk about it now.

{¶ 84} "[JACKSON]: Ok. We'll talk, we'll, I'll just wait until tomorrow."

{¶ 85} In light of the accumulating inculpatory evidence and Roberts's unpersuasive explanations for it, Jackson and Roberts became the prime suspects in Fingerhut's murder. Detective Monroe then arranged for Roberts to call Jackson to ask him some prepared questions and for police to record the conversation. According to Detective Monroe, however, Roberts failed to ask Jackson the critical questions that police had instructed her to ask.

{¶ 86} On December 21, 2001, Roberts was arrested at her home for the murder of Robert Fingerhut. That same day, police raided a home on Wirt

Street in Youngstown, and Jackson surrendered. At that time, Jackson had a bandage wrapped around his left index finger. A search of the Wirt Street home uncovered additional evidence. Included in that evidence was a pair of black leather gloves; the index finger of the left glove appeared to have been torn off, and there was a red substance on the glove near the tear.

{¶ 87} On December 28, 2001, a grand jury indicted Roberts on two counts of aggravated murder related to Fingerhut's death. R.C. 2903.01(A) and (B). Both murder counts carried two death-penalty specifications: murder during an aggravated burglary and murder during an aggravated robbery. R.C. 2929.04(A)(7). The grand jury also indicted Roberts on separate counts of aggravated burglary and aggravated robbery, each carrying a firearm specification.

{¶ 88} At trial, the state presented numerous witnesses establishing the facts previously set forth. The defense presented no witnesses. The jury found Roberts guilty of aggravated murder and the other offenses as charged.

{¶ 89} At the mitigation hearing, Roberts waived the presentation of evidence except for a lengthy unsworn statement. The jury recommended—and the trial court imposed—the death penalty on Roberts.

{¶ 90} In this appeal of her conviction and sentence, Roberts now raises 14 propositions of law. We have reviewed each and determined that Roberts demonstrates no error that would justify reversal of her conviction. Although most of her claims related to sentencing also fail, for the reasons set forth more fully below, we hold that the trial court's sentencing opinion supporting the death penalty is so grievously flawed that it cannot properly support the sentence imposed. We therefore affirm Roberts's convictions and other sentences, but we must vacate the death sentence and remand the cause to the trial court to reconsider the imposition of the death penalty and to prepare a proper sentencing opinion.

## ANALYSIS

## PRETRIAL ISSUES

### The Motion to Suppress

{¶ 91} In proposition of law two, Roberts argues that police exceeded the scope of her consent to search the home during the investigation of Fingerhut's murder and that the trial court erred in failing to suppress her letters to Jackson, which the police seized from inside a bag in the trunk of her car in the attached garage. Roberts contends that a reasonable person would have believed that the police would be searching her house, but not a vehicle in the garage that was not at her home at the time of the offense.

{¶ 92} During the pretrial hearing on appellant's motion to suppress, the state presented several witnesses who testified that Roberts clearly and directly gave police open-ended consent to search the premises. The testimony received at the suppression hearing was consistent: Roberts told police to do whatever they needed to do in their efforts to find out who killed Fingerhut.

{¶ 93} Howland Township police officer Albert Ray, who investigated the murder scene shortly after Roberts called 911, testified that he overheard Detective Paul Monroe tell Roberts that the entire residence was a crime scene and that police needed to look everywhere for evidence or possible suspects. Roberts reportedly responded, "Do whatever you have to do to catch the bastard." Similarly, Detective Sergeant Frank Dillon was at the residence shortly after the body was discovered and heard Detective Monroe explain to Roberts that police would have to go through the entire house because it was a crime scene. According to Detective Sergeant Dillon, Detective Monroe told Roberts that police needed to search for evidence to determine who committed the murder, and Roberts was adamant in her reply: "I don't care, you do what you have to do. I want you to get the person who did this to my Robert."

{¶ 94} Detective Sergeant Monroe himself testified that after he told Roberts that police needed to process the entire house as a crime scene, Roberts said: "[D]o whatever you have to do, search the whole place, just find the guy." He further testified that Roberts gave him permission to look anywhere on the property to find clues as to who had committed the murder.

{¶ 95} Roberts's brother also testified. He stated that his sister was very cooperative with the police and did not rebuff them in any way. According to Roberts's brother, when police told her they wanted to search through the house for clues to the homicide, she told the police, "[D]o what you got to do."

{¶ 96} Captain Karl Compton of the Howland police accompanied Detective Monroe to the home of Roberts's brother on the morning after the murder, at which time Roberts signed the consent form to search the residence and both of the vehicles. According to Detective Monroe, Roberts was very positive about the consent to search and again said, "[D]o whatever you have to do."

{¶ 97} In light of such testimony, the trial court denied Roberts's motion to suppress. The court found that Roberts "repeated the request for the police to find the killer, and there was every reason for the police to take her actions as a request for them to search for evidence. It was reasonable to imply Ms. Roberts [sic] consent to do so. This is reinforced by Ms. Roberts agreeing in writing later on * * * for the police to re-search the house."

{¶ 98} The law in this area is settled. When police conduct a warrantless search, the state bears the burden of establishing the validity of the search. Searches and seizures without a warrant are *"per se* unreasonable" except in a

few well-defined and carefully circumscribed instances. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564. Accord *Payton v. New York* (1980), 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639. It is equally well established, however, that a search of property without a warrant or probable cause but with proper consent having been voluntarily obtained does not violate the Fourth Amendment. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854; *State v. Posey* (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61.

{¶ 99} The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041, 36 L.Ed.2d 854. The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect. *Florida v. Jimeno* (1991), 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297.

{¶ 100} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, [20], 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8.

{¶ 101} We hold that the evidence here adequately supports the trial court's finding that Roberts gave unlimited consent to search the premises of her home. Roberts told Detective Monroe, "[D]o whatever" must be done and to "do what you have to do" in searching the premises. Although Roberts was described as being in a fluctuating emotional state when the consent to search was requested initially, nothing suggests that her state of mind precluded her ability and desire to confer unconditional permission to search.

{¶ 102} A reasonable person in Detective Monroe's position would have understood Roberts's statement, "Do whatever you have to do, search the whole place, just find the [killer]," as permitting voluntary consent to an unlimited search of the residence, including the attached garage where Roberts's car was parked. *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801, 114 L.Ed.2d 297. Indeed, when police contacted Roberts hours later at her brother's home, she repeated her permission

for police to "do whatever [they] have to do" and signed a written consent to search the home and both automobiles. Other courts in similar circumstances have held that consent to search a residence and attached garage encompasses a search of a car found in the garage. See *United States v. Percival* (C.A.7, 1985), 756 F.2d 600, 612–613 (a warrant to search a residence and attached garage authorizes the search of a car found inside the garage); *United States v. Quiroz* (D.Minn.1999), 57 F.Supp.2d 805, 820–821 (voluntary consent to search a residence and attached garage includes the car parked in the garage). Accord *United States v. Caudill* (C.A.6, 2001), 25 Fed.Appx. 349, 353, 2001 WL 1671075. We find such decisions persuasive here.

{¶ 103} Based on the totality of the circumstances presented, we conclude that Roberts gave clear, open-ended permission to the police to search the premises and that her consent extended to the garage and the vehicle therein. The trial court properly denied the motion to suppress. Accordingly, we overrule this claim of error.

## Voir Dire Issues

{¶ 104} In proposition of law three, Roberts contends that in failing to excuse two prospective jurors because of their alleged bias and inability to fairly consider a life-sentence option, the trial court erred.

{¶ 105} R.C. 2313.42(J) contemplates that "good cause" exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." R.C. 2313.43; see *State v. Cornwell* (1999), 86 Ohio St.3d 560, 563, 715 N.E.2d 1144; *State v. Allard* (1996), 75 Ohio St.3d 482, 495, 663 N.E.2d 1277.

{¶ 106} Trial courts have discretion in determining a juror's ability to be impartial, *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323, and such a ruling "will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576. Accord *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646. With these standards in mind, we turn to the specific claims raised by Roberts.

{¶ 107} Alleging that one venireman, Andrew Kotwis, was unable to fairly consider a life sentence, Roberts asserts that the trial court abused its discretion in overruling her challenge to him for cause. Her claim is predicated largely on statements that the prospective juror made indicating that he would consider sympathy for the survivors in deciding whether to vote for a life sentence or the

death penalty. A review of the transcript of the voir dire examination of Kotwis affords perspective and context.

{¶ 108} Kotwis stated that he would "[a]bsolutely" consider all sentencing options. He admitted that he believed that the death penalty provides comfort and solace to the survivors and that sympathy or comfort for the survivors would factor into his decision whether to vote for life or death. But after the trial court instructed Kotwis that sympathy could not be a determining factor in whether to vote for a death sentence, he agreed to obey the instruction. Moreover, Kotwis "[a]bsolutely" agreed with defense counsel that he would consider all sentencing options equally and that no option would "start with a leg up over the other."

{¶ 109} In failing to dismiss Kotwis for cause, the trial court observed that Kotwis "rehabilitated himself" in his answers to the follow-up questions described. In these circumstances, we find no abuse of discretion on the part of the trial court in denying Roberts's request to discharge him for cause. Although Kotwis gave some answers that could be construed as ambiguous, he ultimately stated that he would consider all sentencing options equally. His credibility in making such statements was a matter for the trial judge. *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 ("Deference must be paid to the trial judge who sees and hears the juror"). Roberts fails to demonstrate that we should disturb that finding.

{¶ 110} Roberts next asserts that the trial court abused its discretion in failing to excuse prospective juror Michael Blake, who expressed what Roberts characterizes as a fixed impression of her guilt. During the voir dire examination, Blake initially declared that from what he had read in the news, "they must have had a good reason to arrest [Roberts] * * *. [T]here must be some truth."

{¶ 111} Blake's statements must also be considered in a larger context, however. In other statements, Blake stated that he could set aside anything he had read or heard and that he would consider the case solely on the evidence presented and the court's instructions. Blake conceded that although he believes mass murderers such as Ted Bundy should automatically get the death penalty, every case is different, and he did not presume anyone guilty. And at the conclusion of questioning, Blake reiterated that he would set aside everything he had read or heard about the case and make up his mind solely on the facts presented during trial. The trial court did not abuse its discretion in refusing to excuse prospective juror Blake for cause.

{¶ 112} Roberts claims that she suffered prejudice because she was "forced" to reserve her final peremptory challenge to prevent the impanelment of Kotwis and Blake, who were next in the venire to be seated in the jury box. She also asserts that she was prejudiced by using the two peremptory challenges allotted for alternate jurors to strike Kotwis and Blake. Given our conclusion that there is

no showing that the trial court abused its discretion in rejecting her claims to remove Kotwis and Blake for cause, we reject these contentions.

{¶ 113} Our conclusion is not affected by the fact that an alternate juror was seated on the jury during trial when one juror had to be removed because of an ailment. We have held that a defendant may claim prejudice when she unsuccessfully challenges a venireman for cause and that venireman would have been seated as an alternate juror if the defense had not exercised a peremptory challenge. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61, fn. 1; see, also, *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 61; *State v. Tyler*, 50 Ohio St.3d at 31–32, 553 N.E.2d 576. But implicit in that rule is the requirement of a finding that the trial court should have excused the juror for cause. *Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 61, quoting *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144 ("Ohio law recognizes that 'where the defense exhausts its peremptory challenges before the full jury is seated, *the erroneous denial* of a challenge for cause in a criminal may be prejudicial'"). (Emphasis added.) Here, we have already concluded that the trial court did not abuse its discretion in failing to sustain the challenges for cause raised against the veniremen.

{¶ 114} Moreover, Roberts fails to show that any of the jurors ultimately seated were other than impartial. Thus, she fails to demonstrate a violation of the Due Process Clause of the United States Constitution. See *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682. Accordingly, we reject Roberts's suggestion that there was error in the trial court's decisions in empaneling the jury.

### Change of Venue

{¶ 115} In proposition of law seven, Roberts attacks the trial judge's decision to deny her motion for a change of venue. In support of her contentions, Roberts points to pervasive pretrial publicity regarding the murder, Jackson's trial (which occurred only months prior to her own trial), and the state's theory of her complicity in the murder. Although there may have been a great deal of publicity about the murder and Jackson's trial in Trumbull County, we do not agree that Roberts shows that media coverage of the murder so saturated the county and influenced the potential venire that she was deprived of a fair trial.

{¶ 116} A trial court's ruling on a motion for a change of venue pursuant to Crim.R. 18(B) will not be disturbed on appeal unless the court abused its discretion. See, e.g., *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710. We have long held that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair

and impartial jury from the community. See *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 35; *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710; *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

{¶ 117} A defendant claiming that pretrial publicity denied her a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996. Pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial. *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683. Only in rare cases may prejudice be presumed. *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 118} We have held that extensive voir dire helps to eliminate any negative effect arising from the pretrial publicity, *Lundgren*, 73 Ohio St.3d at 479–480, 653 N.E.2d 304, and the trial court here engaged in such an effort. The trial court held Roberts's motion to change venue in abeyance in order to determine whether pretrial publicity tainted the jury pool. It then conducted a thorough voir dire, as evidenced by the facts that voir dire took a month to complete and encompasses more than 20 volumes and approximately 4,700 pages of transcript. Near the conclusion of voir dire, the trial court overruled the motion to change venue, stating: "[T]he Court feels very comfortable that this case can be fairly tried in this county * * *."

{¶ 119} To support her claim that fairness was lacking and that pretrial publicity impaired the trial court's ability to seat an impartial jury, Roberts cites the voir dire of seven prospective jurors. However, four of these prospective jurors never sat on the final panel, so prejudice to Roberts is not shown. *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 120} Nor does the fact that three jurors had heard about some aspects of the case prior to trial necessarily reflect bias or lack of impartiality. See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 37–41; *State v. Bies* (1996), 74 Ohio St.3d 320, 324, 658 N.E.2d 754. Moreover, defense counsel passed for cause on those three jurors and did not exercise a peremptory challenge on any of them, even though Roberts had remaining peremptory challenges at the time those jurors were seated. As we observed in a similar situation: "The absence of defense challenges for pretrial publicity and the failure to exhaust defense peremptory challenges indicate that the defense was not particularly troubled by the jury's exposure to pretrial publicity once voir dire was completed." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37. So, too, here.

{¶ 121} Accordingly, we hold that there is not a sufficient showing that the trial court abused its discretion in denying Roberts's motion for change of venue. See

*State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 30. We reject Roberts's claim to the contrary.

## TRIAL ISSUES

### *Sufficiency of Evidence*

{¶ 122} Roberts argues in proposition of law four that the evidence at trial did not sufficiently establish the theft element of aggravated robbery and the corresponding capital specification.

{¶ 123} When we review a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. A verdict will not be disturbed on appeal on sufficiency grounds unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096.

{¶ 124} In her effort to show that the evidence was insufficient to demonstrate theft, Roberts points out that Fingerhut's wallets, one of which contained large amounts of money, were found with his body after the murder. She then challenges the state's theory that the theft element was established by Jackson's use of Fingerhut's car to escape.

{¶ 125} In her latter analysis, Roberts does not deny that Jackson drove away from the crime scene in Fingerhut's car. Indeed, the evidence shows that Jackson shot Fingerhut and drove from the scene in Fingerhut's automobile. Rather than attacking the facts, Roberts argues the law.

{¶ 126} Roberts claims that the taking of the car does not constitute a theft offense because Jackson did not keep the car or try to sell it, but rather, merely drove it to Youngstown and abandoned it with the keys inside. In other words, she claims that because Jackson merely used the vehicle as a means of escape, taking it cannot constitute a theft offense. We reject that assertion.

{¶ 127} The evidence established that Jackson asserted control over the keys to Fingerhut's car and the car itself. He therefore deprived Fingerhut of that property. See *State v. Biros* (1997), 78 Ohio St.3d 426, 450, 678 N.E.2d 891. The fact that Jackson did not keep or sell the car for financial gain does not matter;

the only purpose required for theft is "purpose to deprive the owner of [the] property" in question. R.C. 2913.02(A).

{¶ 128} Roberts next challenges the conviction with a contention that there is no evidence that Jackson formed the intent to take Fingerhut's automobile until after he murdered Fingerhut. Assuming purely arguendo that the evidence supports such a conclusion (and we think it does not), the claim fails.

{¶ 129} We repeatedly have rejected the argument that there is no aggravated robbery when the victim's property is taken after he is murdered. "[T]he victim of a robbery, killed just prior to the robber's carrying off [his] property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching [him] die, and then stealing [his] property after the death." *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510. Accord *State v. Rojas* (1992), 64 Ohio St.3d 131, 139, 592 N.E.2d 1376.

{¶ 130} The evidence was sufficient to support a finding that the killing was associated with the aggravated robbery of Fingerhut's keys and car as part of one continuous occurrence, see *State v. Williams* (1996), 74 Ohio St.3d 569, 577, 660 N.E.2d 724, and we hold the evidence sufficient to support the jury's verdict beyond a reasonable doubt on the essential elements of aggravated robbery, R.C. 2911.01, and on the R.C. 2929.04(A)(7) capital specification, aggravated robbery in connection with aggravated murder.

### *Jury Instructions*

{¶ 131} In proposition of law 11, Roberts contends that the trial court erred in instructing the jury on reasonable doubt based on the statutory definition of R.C. 2901.05. During trial, however, she failed to object to the instruction on the basis asserted here. She thus waives all but plain error, *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus, and we find no such error. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus.

### SENTENCING ISSUES

### *Waiver of Mitigation*

{¶ 132} In proposition of law one, Roberts contends that a waiver of mitigation evidence is not valid unless the defendant is informed that the waiver will result in the death penalty. In addition, Roberts submits that such a waiver is invalid if the defendant intends to present any mitigation evidence in any form.

{¶ 133} At the outset of the mitigation phase, Roberts informed her counsel that she did not wish to present any mitigating evidence to the jury except an unsworn statement. During the ensuing in camera hearing on this issue, the court explained to Roberts the purpose of the mitigation phase and her right to present mitigation evidence. The judge then inquired as to whether Roberts had instructed her attorneys not to present such evidence; she confirmed that the court's understanding was correct. Roberts explained to the trial judge that she had talked with her attorneys, family, and friends before declaring, "I know what I am doing. I explained to everyone that cares why I am doing it."

{¶ 134} Trial counsel described for the judge the evidence that could be presented in mitigation. Counsel noted that professionally and personally, he disagreed with Roberts's decision not to present such evidence but that he believed her competent and that the decision was the product of rational thought.

{¶ 135} The court then heard from Dr. Thomas Eberle, a psychologist who had evaluated Roberts earlier during the prosecution and who did so again just prior to the hearing. Dr. Eberle testified that Roberts's decision to forgo presentation of mitigating evidence was rational. He further found that she suffered no psychiatric or psychological abnormality that would prohibit a rational decision regarding presentation of mitigating evidence.

{¶ 136} Having heard the foregoing testimony, the trial court specifically inquired of Roberts whether she understood that "by waiving the presentation of mitigating evidence, this Jury has little to go upon in coming up with something other than the death penalty." Roberts replied: "That is what I hope for. * * * I know what I am doing and I know why. Thank you for asking." The court then found that the decision to forgo mitigation evidence was a voluntary one made without any reluctance, that Roberts had reiterated that decision repeatedly, and that she appeared relieved to have made it. The court found that Roberts understood that her decision was irrevocable, and it accepted her decision to forgo the presentation of mitigation evidence.

{¶ 137} Roberts later presented an unsworn statement to the jury. In that statement, she told the jury that she would not provide any mitigating evidence. She then said, "You are bound by law to give me one sentence, the death penalty. You have no other choice. That is what I'm asking you to do, because that is the right thing to do." She reiterated that objective after the trial court sentenced her to death.

{¶ 138} With this factual background in mind, we turn to the law.

{¶ 139} The United States Supreme Court has never suggested that the Eighth Amendment requires forcing an unwilling defendant to present mitigating evidence in a capital case. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 63, 706

N.E.2d 1231. No societal interest counterbalances the defendant's right to control his or her own defense. *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576.

{¶ 140} We have held that a defendant is entitled to decide what she wants to argue and present as mitigation in the penalty phase, see, e.g., *Jenkins*, 15 Ohio St.3d at 189, 15 OBR 311, 473 N.E.2d 264, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973, including the decision to present no evidence. Ohio's death-penalty statute itself confers "great latitude" on a defendant in such decisions. R.C. 2929.04(C). See, also, *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47. Roberts was entitled to present no mitigation evidence.

{¶ 141} Her contention that she did not fully understand the ramifications of her decision and that the trial judge did not sufficiently inquire of her in that regard is belied by the record. As set forth above, the record clearly establishes that the trial judge specifically addressed the likelihood of the jury's imposing a death sentence if Roberts failed to present mitigating evidence and that she understood that a death sentence was the probable outcome. In fact, Roberts asked the jury to impose that sentence. We reject her claim that she did not understand that the waiver would yield such a result.

{¶ 142} We now turn to Roberts's suggestion that her waiver of the right to present mitigation evidence was not a complete waiver.

{¶ 143} Roberts contends that she entered only a "partial waiver" because she gave an unsworn statement and that a partial waiver does not constitute a valid waiver. Roberts cites no decision to support her assertion, nor are we aware of any such authority. We do recognize, however, our prior holding in *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 72–76, in which we concluded that the requirements of *Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus, do not apply when a defendant makes an unsworn statement and presents minimal evidence in mitigation. Our emphasis in *Ashworth* was to require an inquiry of "a defendant only in those situations where the defendant chooses to present *no* mitigating evidence whatsoever." (Emphasis added.) *Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 74. Here, Roberts presented an unsworn statement. An unsworn statement can constitute critical mitigating evidence. See *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, at ¶ 64; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 110. *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 50. We decline to extend *Ashworth* to the context Roberts presents.

{¶ 144} Moreover, we have never held that a partial waiver of the right to present mitigating evidence is an invalid exercise of that right. To the contrary, we have upheld the death sentences in several cases in which the defendant chose

to present only an unsworn statement to the jury in mitigation. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 113–114; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 22; *Tyler*, 50 Ohio St.3d at 28, 553 N.E.2d 576; *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 47.

{¶ 145} In any event, the record reflects that the trial judge complied with the *Ashworth* requirements. We reject Roberts's claims of error in the trial court's decisions with respect to her decision to waive mitigating evidence.

### Effective Assistance

{¶ 146} Similarly, in proposition of law eight, to the extent that Roberts argues that trial counsel were ineffective for failing to properly advise her and ensure that she understood the ramifications of her waiver of her right to present mitigating evidence, her claim fails.

{¶ 147} Reversal of a conviction for ineffective assistance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 148} We again reject Roberts's contentions that she did not understand the full ramifications of waiving her right to present and argue mitigation evidence. The record shows that Roberts understood what she was doing when she decided to present only her unsworn statement during the mitigation hearing. The record also establishes that the trial court explained sufficiently the ramifications of that decision, that Roberts essentially told the trial court that she was not presenting additional mitigating evidence because she wanted to be given a death sentence, and that she disregarded her attorneys' advice and instead directed them not to present any mitigating evidence beyond her unsworn statement. An attorney does not render ineffective assistance by declining, in deference to a client's desires, to present evidence in mitigation. See, e.g., *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100; *State v. Cowans* (1999), 87 Ohio St.3d 68, 81, 717 N.E.2d 298; *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47. Her claims that counsel was constitutionally ineffective fail.

### Cumulative Error

{¶ 149} Although Roberts claims in proposition of law 12 that a combination of errors by the trial court and prosecution and ineffectiveness of counsel deprived her of a fair trial, she offers no analysis of substance to support those claims.

She thus fails to demonstrate that she was denied a fair trial. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103.

### Jury Instructions

{¶ 150} Roberts asserts in proposition of law ten that it was error for the trial court to use the term "recommendation" in its sentencing instructions to the jury. The term "recommendation" in a jury instruction, however, accurately reflects Ohio law and does not constitute prejudicial error. *State v. Clemons* (1998), 82 Ohio St.3d 438, 444, 696 N.E.2d 1009; *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 651 N.E.2d 965.

### Proportionality Review

{¶ 151} We summarily reject Roberts's challenges in proposition of law 13 to Ohio's system of proportionality review in light of our precedent. See *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 86; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383.

### Constitutionality

{¶ 152} We summarily reject Roberts's various constitutional claims in proposition of law 14. See, e.g., *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *State v. Carter* (2000), 89 Ohio St.3d 593, 608, 734 N.E.2d 345; *State v. Gumm* (1995), 73 Ohio St.3d 413, 417–418, 653 N.E.2d 253; *State v. Henderson* (1988), 39 Ohio St.3d 24, 29, 528 N.E.2d 1237; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598; *State v. Buell* (1986), 22 Ohio St.3d 124, 135–142, 22 OBR 203, 489 N.E.2d 795; and *State v. Jenkins*, 15 Ohio St.3d at 167–178, 15 OBR 311, 473 N.E.2d 264.

### Sentencing Opinion

{¶ 153} Having disposed of the substantial majority of Roberts's claims, we now turn to a critical one. In proposition of law six, Roberts asserts that the trial court erred in allowing the prosecutor to assist in drafting the court's sentencing opinion. The claim arises from the facts that follow.

{¶ 154} At the sentencing hearing, the court read aloud its sentencing opinion and imposed the death penalty on Roberts. As the court was doing so, defense counsel noticed that the prosecutor was looking at a document and appeared to be reading along with the trial judge. At the end of the court's reading, defense counsel raised a "vehement" objection to the prosecution's apparent ex parte involvement with the sentencing opinion.

{¶ 155} The trial judge conceded that the prosecution had participated in the drafting of the opinion without the knowledge of defense counsel. The trial judge stated that he had given notes to the prosecutor and had instructed the prosecutor, "[T]his is what I want." The court added that the opinion had to be corrected six or seven times. The trial judge apologized to defense counsel for not providing them with a copy of the opinion before the sentencing hearing.

{¶ 156} R.C. 2929.03 governs the imposition of sentences for aggravated murder. R.C. 2929.03(F) clearly contemplates that the trial court itself will draft the death-sentence opinion: *"The court * * * when it imposes sentence of death, shall state* in a separate opinion *its* specific findings as to the existence of any of the mitigating factors * * *, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors * * *."* (Emphasis added.)

{¶ 157} Our prior decisions have stressed the crucial role of the trial court's sentencing opinion in evaluating all of the evidence, including mitigation evidence, and in carefully weighing the specified aggravating circumstances against the mitigating evidence in determining the appropriateness of the death penalty. For example, in *State v. Green* (2000), 90 Ohio St.3d 352, 360, 738 N.E.2d 1208, we vacated the death penalty because the trial court's sentencing opinion "was constitutionally deficient." There, the trial court's sentencing opinion "improperly considered nonstatutory aggravating circumstances, and failed to consider relevant mitigating evidence." Id. We concluded that "the collective deficiencies in the trial court's decision to impose the death penalty, as reflected in the sentencing opinion, undermine our confidence in that decision. * * * These cumulative errors reflect grievous violations of the statutory deliberative process." Id. at 363–364, 738 N.E.2d 1208.

{¶ 158} Similarly, in *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925, we vacated the death sentence because of grievous errors in the trial court's sentencing opinion. In *Davis,* we noted, "[T]he General Assembly has set specific standards in the statutory framework it created to guide a sentencing court's discretion 'by requiring examination of *specific factors* that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.'" (Emphasis sic.) Id. at 372–373, 528 N.E.2d 925, quoting *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913.

{¶ 159} In this case, our confidence in the trial court's sentencing opinion is undermined by the fact that the trial judge directly involved the prosecutor in preparing the sentencing opinion and did so on an ex parte basis. The trial judge is charged by statute with the sole responsibility of personally preparing the

opinion setting forth the assessment and weight of the evidence, the aggravating circumstances of the murder, and any relevant mitigating factors prior to determining what penalty should be imposed. The fact that the trial judge provided his notes to the prosecutor to guide the prosecutor in drafting the sentencing opinion does not change the result. The various drafts of the opinion that ultimately imposed death on Roberts involved the assistance of the prosecutor.

{¶ 160} The trial court's delegation of any degree of responsibility in this sentencing opinion does not comply with R.C. 2929.03(F). Nor does it comport with our firm belief that the consideration and imposition of death are the most solemn of all the duties that are imposed on a judge, as Ohio courts have recognized. See *State v. Vrabel* (Mar. 2, 2000), Mahoning App. No. 95 CA 221, 2000 WL 246482, *15 ("The role of this Court in reviewing a death penalty case is codified by statute and defined by the Ohio Supreme Court. It is a duty of immense proportions which we undertake with great solemnity"). The judge alone serves as the final arbiter of justice in his courtroom, and he must discharge that austere duty in isolation. The scales of justice may not be weighted even slightly by one with an interest in the ultimate outcome. Given the prosecutor's direct role in the preparation of the sentencing opinion, we cannot conclude that the proper process was followed here.

{¶ 161} That conclusion is compelled particularly in light of the trial court's ex parte communications about sentencing with the prosecutor in preparing the sentencing opinion. The Code of Judicial Conduct, Canon 3(B)(7) specifies, "A judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding * * *." Both the trial judge and the prosecutor should have known that any ex parte assistance in the preparation of the court's sentencing opinion was wholly inconsistent with these vital ethical constraints. See Disciplinary Rule 7–110(B)(2) and (3).

{¶ 162} The trial court's consultation with the prosecutor, particularly when undertaken without the knowledge or participation of defense counsel, can neither be ignored nor found to be harmless error. Cf. *Gardner v. Florida* (1977), 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information [from a presentence report] which he had no opportunity to deny or explain"). We cannot cure the deficiencies in the preparation of the sentencing opinion by our own independent assessment.

{¶ 163} The trial court's decision to use the prosecutor in preparing the sentencing opinion constitutes a grievous violation of the statutory deliberative process. It is so severe a violation that independent reweighing cannot serve as

an adequate remedy. See *State v. Green*, 90 Ohio St.3d at 363–364, 738 N.E.2d 1208. We find that we must vacate the sentence because of the critical constitutional interests and notions of justice that are implicated by the prosecutor's participation in drafting the sentencing opinion.

{¶ 164} We accordingly sustain Roberts's claim of error in the trial judge's use of the prosecutor to assist directly in the preparation of the sentencing opinion. Accordingly, we vacate the sentence and remand to the trial court for resentencing as set forth expressly below.

### Allocution Rights

{¶ 165} Finally, we turn to Roberts's claim in proposition of law five that the trial court committed reversible error by not affording Roberts the right of allocution before announcing the sentence.

{¶ 166} Crim.R. 32(A)(1) provides that before imposing sentence in a criminal trial, the trial court shall "address the defendant personally" and ask whether he or she wishes to make a statement on her own behalf or present any information in mitigation of punishment. Because we have vacated the death sentence and remanded the case, this issue is now moot. The trial court shall provide Roberts with her right of allocution before imposing any new sentence.

### CONCLUSION

{¶ 167} Having found no prejudicial error in regard to Roberts's convictions, we affirm the convictions and the judgment of the trial court pertaining to them. Because of the prejudicial error in sentencing Roberts to death, the sentence of death is vacated, and the cause is hereby remanded to the trial court. On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death penalty as required by R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

David L. Doughten and Patricia J. Smith, for appellant.