OPINION *Page 2 
{¶ 1} Appellant was found delinquent of one count of conspiracy to commit murder. Appellant now seeks to appeal. The facts which led to the delinquency charge were in pertinent part as follows:
 STATEMENT OF FACTS AND CASE {¶ 2} Appellant, Jerrica Garn, and the juvenile victim, Brittany, are students at Clearfork High School, in Bellville, Ohio.
 {¶ 3} Appellant and Brittany, met in the fall of 2005. On or about September 11, 2005, Brittany introduced appellant to Brittany's boyfriend, Darren Stevens.[1] The appellant became infatuated with Darren and the relationship between the two girls eventually became strained.
 {¶ 4} On or about, September 15, 2006, Clearfork High School assistant principal, Don Thogmartin, received two notes which had been written by the appellant. The most concerning note contained suicidal thoughts and talk about murdering Brittany. Specifically the note stated, "she is so nasty it just makes me want to murder her. I could stab her and feel absolutely no remorse. Just because I fucking hate her and she knows I hate her, so that makes it all that much better." (Transcript of Proceedings on May 8, 2006 at pages 85-86, hereinafter TI). Pursuant to school policy, the appellant was suspended. Thereafter, appellant was expelled from school for the entire first semester. As a result of the expulsion, appellant was not permitted back on Clearfork school grounds until January 17, 2006.
 {¶ 5} In November of 2005, Darren Stevens began dating the appellant and Brittany simultaneously. Brittany refused to believe that the appellant and Darren had an *Page 3 
ongoing relationship, and Brittany continued to have a relationship with Darren. This caused the appellant to develop an intense hatred for Brittany. From the fall of 2005, until January 27, 2006, appellant's intense hatred led to repeated conversations with three other Clearfork students, Rachel, Chelsea, and Kayla, about murdering Brittany.
 {¶ 6} On January 17, 2006, appellant returned to attend the second school semester. Upon returning to school, the appellant, Rachel and Chelsea formed a gang called "Chicks Before Dicks Forever" or "CBD4". Their slogan was "we don't play the game, we run it." Their rules included that (1) no one would rat out another gang member; (2) all gang members were to meet if there was a fight or a killing; (3) They were all together on everything; and (4) They wouldn't put up with anything. (State's Exhibit # 4[2], Transcript of Proceedings on May 9, 2006 at pages 91-92, hereinafter T.II.__).
 {¶ 7} On January 23, 2006, appellant and Rachel entered into a verbal agreement to kill Brittany. Verbally, the girls agreed that in the morning on Friday, January 27, 2007, Rachel would give the appellant a key to Rachel's house. The appellant would then go to Rachel's house. Rachel agreed to pretend that she hated the appellant. Rachel also agreed to lure Brittany to come to her house after school. The girls agreed that when they got to the house, appellant would be waiting to commit the murder. They agreed to beat Brittany to death with bats and bamboo sticks, cut up her body with daggers and distribute her body parts in two nearby ponds. Afterward the two girls were going to run away to either Florida or Michigan until they were eighteen years of age. According to Rachel, "the plan was serious". (T.II. 78-80 and 84-86) *Page 4 
 {¶ 8} The girls then began exchanging notes regarding the murder plan. The notes were exchanged "hand-to-hand" between classes. (T.II. 93). The girls exchanged several notes. On January 24, 2006, the appellant exchanged a note with Rachel and Chelsea in the girls school bathroom. In the note, the appellant laid out the specifics of the plans for Brittany's murder. The note further instructed the other girls to flush the note down the toilet after the note had been read. (State's Exhibit No. 10, T. II.111-113.) In response to appellant's written murder plan, Rachel wrote that she thought the plan was "real good".
 {¶ 9} On January 25, 2006, appellant wrote "I'm so excited about Friday! Seriously excited. Cause I have built up so much rage for her. So much. Her tomb stone is going to say: 9-29-89 to 1-27-06". (State's Exhibit No. 12, T.II.119). That same day, Rachel made plans with Brittany to run away on Friday, January 27, 2006. She admitted that she encouraged Brittany to bring her clothes to school so that they would only have to stop at Rachel's house before leaving. (Transcript of Proceedings on May 9, 2006, at page139.) Rachel also stated that the girls had planned to cut up Brittany's body with the two daggers she kept in her bedroom. (T.II.167 and 170).
 {¶ 10} On January 25, 2006, at approximately 11:31 P.M., the appellant used the phone at Chelsea's house to leave a threatening message on Brittany's home phone answering machine regarding the murder scheduled to occur on Friday, January 27th . Brittany received the message on the morning of January 26, 2006. In the recorded message, the appellant stated, "Hey bitch. Look, you might not want to leave on Friday. You might end up dead." *Page 5 
 {¶ 11} Investigating officer, Sheriff Nicholson, responded to Brittany's home, listened to the message and drafted an aggravated menacing summons for the appellant. Sheriff Nicholson then went to Clearfork High School to talk with the principal and serve the summons. Principal Moore informed the investigating office of the prior incident involving the two girls in September of 2005. The principal then gave the investigating officer the appellant's address and asked him to tell the appellant that she was not permitted to return to school without her mother.
 {¶ 12} Later that morning the investigating officer found the appellant at her residence with her mother. He served the aggravated menacing summons and advised the appellant that she was not permitted to return to school without her mother.
 {¶ 13} On Friday, January 27, 2006, appellant returned to the school without her mother. Assistant Principal Thogmartin observed the appellant and Rachel talking. Mr. Thogmartin took the appellant to the principal's office. Principal Moore spoke with the appellant and emptied the contents of her purse including a zippered pocket which contained a hand written note about the murder plan. Principal Moore took the note and provided it to the investigating officers.
 {¶ 14} In a taped statement taken in the presence of Sheriff Mack of the Richland County Sheriff's Department, the appellant stated that she hoped the bitch (Brittany) was dead. In response to whether she thought the murder plan would have gone forward if she hadn't been caught, she stated that she wasn't sure because she didn't know if Rachel was going to be successful at luring Brittany to the house. (T.II. 27 and 30.) *Page 6 
 {¶ 15} On January 30, 2006, appellant was placed in detention and charged with conspiracy to commit murder. Specifically, the State of Ohio alleged that appellant conspired with Rachel (a juvenile co-defendant), and Chelsea (a juvenile) to commit the murder of Brittany, (a juvenile). Rachel was also charged with conspiracy to commit murder and at a separate adjudicatory hearing pleaded true to the charge.
 {¶ 16} On March 21, 2006, appellant filed a motion to suppress the notes which had been collected by Principal Moore from the appellant's purse on January 27, 2006. The trial court conducted a hearing on the matter. On April 25, 2006, by judgment entry, the trial court denied appellant's motion.
 {¶ 17} The matter proceeded to trial on May 8, 2006, and May 9, 2006. During the trial several witnesses testified in the State's case including: Principal Moore, Assistant Principal Thogmartin, Rachel, Chelsea, Kayla, Brittany, and Deputy Nicholson. On May 11, 2006, the trial court announced its adjudication in open court. During the proceeding the trial court found appellant to be delinquent for having committed one count of conspiracy to commit murder. The trial court further ordered appellant to the Department of Youth Services for an indeterminate period of one year up to the age of 21 years. It is from this adjudication and disposition that appellant now seeks to appeal setting forth the following assignments of error:
 {¶ 18} "I. THE RICHLAND COUNTY JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO SUPPRESS THE EVIDENCE OBTAINED BY JERRICA GARN'S HIGH SCHOOL PRINCIPAL AS A RESULT OF AN UNREASONABLE SEARCH AND SEIZURE.FOURTH AMENDMENT TO THE *Page 7 
UNITED STATES CONSTITUTION AND SECTION FOURTEEN ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 19} "II. THE RICHLAND COUNTY JUVENILE COURT DENIED JERRICA GARN HER STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN IT ADJUDICATED HER DELINQUENT FOR CONSPIRACY TO COMMIT MURDER IN THE ABSENCE OF SUFFICIENT EVIDENCE TO SUPPORT THE ADJUDICATION. FIFTH,SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, SECTIONS FIVE AND SIXTEEN, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 20} "III. THE TRIAL COURT VIOLATED JERRICA GARN'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED AN ADJUDICATION FOR CONSPIRACY TO COMMIT MURDER AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. FIFTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION SIXTEEN, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 21} "IV. JERRICA GARN WAS DENIED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION."
 I {¶ 22} In the first assignment of error, appellant argues that the testimony of Principal Moore presented by the State, during the suppression hearing, was vague, later contradicted at trial, and therefore was not credible evidence upon which the trial *Page 8 
court could overrule the motion to suppress. Appellant further argues that the trial court's decision overruling the motion to suppress was against the manifest weight of the evidence. We disagree.
 {¶ 23} At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses. State v.Oliver, 112 Ohio St. 3d 447, 2007-Ohio-372, 860 N.E.2d 1002; State v.Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 981-982; State v.Fanning (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 57-58, 437 N.E.2d 583,584-585. The trial court in a suppression hearing is in the best position to evaluate the credibility of witnesses. State v. Klein
(1991), 73 Ohio App.3d 486, 597 N.E.2d 1141.
 {¶ 24} Furthermore, on appeal, one of the methods for challenging a trial court's ruling on a motion to suppress is to challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. State v. Fanning (1982),1 Ohio St.3d 19; State v. Klein (1991), 73 Ohio App.3d 486; State v.Guysinger (1993), 86 Ohio App.3d 592. Generally, appellate courts should give great deference to the judgment of the trier of fact. State v.George (1989), 45 Ohio St.3d 329, 544 N.E.2d 640. Accordingly, an appellate court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Klein, supra;State v. Roberts, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168.
 {¶ 25} During the suppression hearing, Principal Moore testified that he and Assistant Principal Thogmartin emptied the contents of the appellant's purse. However, during the adjudicatory hearing Assistant Principal Thogmartin testified that he and *Page 9 
Principal Moore assisted each other in reviewing the contents of the co-defendant Rachel's purse but stated that only Principal Moore participated in examining the contents of the appellant's purse. Appellant argues that these two statements are in direct contradiction and therefore the trial court improperly relied on Principal Moore's testimony. However, we find that appellant's suggestion that Principal Moore is not truthful is self-serving at best, since it is unclear whose recollection regarding the presence of the other party is in fact correct. However, it is apparent from the record that Principal Moore's testimony regarding the reasonableness of the inception of the search, the scope of the search and the seizure of the threatening note from a zippered pocket of the appellant's purse, are not contradicted. Therefore we do not find the trial court's reliance on Principal Moore's testimony to be error.
 {¶ 26} We now turn to whether the facts presented during the suppression hearing support the trial court's decision to overrule the motion to suppress. In New Jersey v. T.L.O. (1985), 469 U.S. 325,105 S.Ct. 733, 742-743, the United States Supreme Court set forth the standard for the search and seizure of items in the personal possession of public school students. Specifically, the Court stated:
 {¶ 27} "[T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider *Page 10 
`whether the . . . action was justified at its inception,' Terry v.Ohio, 392 U.S., at 20, 88 S.Ct., at 1879;[3] second, one must determine whether the search as actually conducted `was reasonably related in scope to the circumstances which justified the interference in the first place,' ibid. Under ordinary circumstances, a search of a student by a teacher or other school official will be `justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Jersey v. T.L.O. supra at 341-342.
 {¶ 28} The Court also stated that "[t]his standard will, we trust, neither unduly burden the efforts of school authorities to maintain order in their schools nor authorize unrestrained intrusions upon the privacy of schoolchildren. By focusing attention on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense. At the same time, the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." Id at 343.
 {¶ 29} The Court also recognized that "the maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform *Page 11 
themselves to the standards of conduct prescribed by school authorities. The Court further stated, "We have repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards * * *"Tinker v. Des Moines Independent Community School District (1969),393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731.
 {¶ 30} During the suppression hearing, Principal Moore testified that in September of 2005, he became aware of threats by the appellant toward Brittany. During the investigation in September he seized hand written notes from the appellant in which she had recorded a desire to murder Brittany.
 {¶ 31} Principal Moore also stated that in January of 2006, after speaking with Sheriff Nicholson, he once again became concerned about the safety of the students and staff at Clearfork. He stated that the students attending the school are provided with a code of conduct and are informed that their lockers and personal belongings may be subject to a search by school officials. (Transcript of Suppression Hearing at page 11, hereinafter Suppression T. at) He testified that on January 27, 2006, the appellant returned to school without her mother. Principal Moore believed that school policy and the totality of the circumstances which included a threatening phone message, prior murder threats, and the appellant's unaccompanied presence gave him reasonable cause to search appellant's person and the contents of her purse. He further felt that the scope of the search could reasonably extend to not only search for weapons but for other evidence of any plan to carry out the threats of violence. Specifically. Principal Moore stated, "my immediate reaction was * * *same student, same type of threat made *Page 12 
as what we had back in September". Principal Moore further testified that, "kids write things down that they don't often talk about", meaning it is not unusual to learn about threats of violence through a student's written thoughts. Suppression T. at 85. He further stated that his actions were motivated by his responsibility to provide protection for students and staff, and to maintain a quality learning environment for the students. Suppression T. at 79
 {¶ 32} Upon review we find that the evidence supports the trial court's finding that Principal Moore's actions were justified at the inception and that the scope of the search was reasonably related to the conduct which justified the intrusion at the inception. Principal Moore's decision was suitably based on his common sense, his duty to students and staff, and his experience in light of the circumstances. Furthermore, we find that the search was not excessively intrusive in light of the age of the appellant and the nature of the threats, i.e. murder. Therefore, the trial court's decision to overrule appellant's motion to suppress was not against the manifest weight of the evidence.
 {¶ 33} Accordingly, appellant's first assignment of error is not well taken and is hereby overruled.
 II, III {¶ 34} Appellant argues in the second and third assignments of error that the complaint was deficient in that it failed to sufficiently identify and define the offense of conspiracy to commit murder. Appellant further argues that the trial court's adjudication of delinquency by reason of having committed conspiracy to commit murder, is against the manifest weight and sufficiency of the evidence. In each instance the appellant *Page 13 
alleges that the State failed to allege and prove that appellant engaged in a substantial overt act in furtherance of the conspiracy to commit murder.
 {¶ 35} In State v Papp, (1980), 68 Ohio App. 2d 21, 426 N.E.2d 518, the court held that the conspiracy statute requires that a substantial overt act be alleged in a charging document and that it be proved beyond a reasonable doubt at trial. Id at paragraph three of the syllabus.
 {¶ 36} Appellant concedes that there was no pretrial objection to the sufficiency of the complaint and no motion filed to dismiss the complaint as being deficient. Such a failure acts as a waiver on appeal. See In re Good (1997), 118 Ohio App.3d 371, 692 N.E.2d 1072, appeal dismissed, 79 Ohio St.3d 1418. However, Appellant moves this Court to consider the alleged error as plain error.
 {¶ 37} Appellant contends that the complaint does not satisfy Juv.R.10 because appellant's note writing as set forth in the "to wit" section of the complaint is insufficient to allege a substantial overt act for conspiracy to commit murder. Appellant argues that this alleged defect is plain error. We disagree.
 {¶ 38} An error is plain error if it affects the substantial right of the defendant to have judicial proceedings conducted according to law.State v. Richter (1993), 92 Ohio App. 3d 395, 399, 635 N.E.2d 1295; See also State v. Fisher, 99 Ohio St. 3d 127, 2003-Ohio-2761,789 N.E.2d 222, at paragraphs 7-8.
 {¶ 39} The form of a juvenile complaint is governed by Juv.R. 10(B) which states in pertinent part that a juvenile complaint must "state in ordinary and concise language the essential facts that bring the proceeding within the jurisdiction of the court" *Page 14 
 {¶ 40} The complaint against the appellant Jerrica Garn, stated in pertinent part as follows:
 {¶ 41} "Complainant, upon information and belief has knowledge of a certain child, to wit:
 {¶ 42} JERRICA L. GARN, 15 years of age, DOB: 05/31/1990, who appears to be a delinquent child, in that: on or between the 23rd
day of January, 2006 and the 27th day of January, 2006, in Richland County, Ohio, did with purpose to commit or promote or facilitate the commission of a murder with another person or persons, plan or aid in planning the commission of a murder with another person or persons and further a substantial overt act in furtherance of the conspiracy was performed, to wit: alleged delinquent children corresponded in writing regarding the goal of the conspiracy, causing the death of another, in violation of section 2923.01(A)(1) and 2151.02
of the Ohio Revised Code, a felony of the first degree if committed by an adult."
 {¶ 43} We find that the complaint was sufficient to place the appellant on notice of the charged offense of conspiracy to commit murder where the alleged substantial overt act was the detailed correspondence regarding the murder plan.
 {¶ 44} We now address appellant's arguments regarding manifest weight and sufficiency of the evidence. In considering an appeal concerning the sufficiency of the evidence, our standard of review is as follows: "[T]he inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 273,574 N.E.2d 492.
 {¶ 45} Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the *Page 15 
evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, at paragraph one of the syllabus.
 {¶ 46} In this case appellant was adjudicated delinquent by reason of having committed conspiracy to commit murder. Appellant argues that there was no sufficient evidence of a substantial overt act in furtherance of the conspiracy and therefore the adjudication was against the manifest weight of the evidence.
 {¶ 47} Revised Code Section 2923.01 defines conspiracy and provides in pertinent part as follows:
 {¶ 48} "(A) No person, with purpose to commit or to promote or facilitate the commission of * * * murder * * * shall do either of the following:
 {¶ 49} "(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
 {¶ 50} "(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission any of the specified offenses. *Page 16 
 {¶ 51} "(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed. * * *"
 {¶ 52} * * * (H)(1) No person shall be convicted of conspiracy upon the testimony of a person with whom the defendant conspired, unsupported by other evidence.
 {¶ 53} For purposes of the conspiracy statute, the phrase "overt act" means an open act, done outwardly, without attempt at concealment, and performed pursuant to and manifesting a specific intent or design and the act is substantial when it is of such character as to manifest a purpose on the part of an actor that the object of the conspiracy should be completed. State v Papp (1980), 68 Ohio App. 2d 21, 426 N.E.2d 518, syllabus at 1.
 {¶ 54} Revised Code Section 2923.01, does not require that both parties intend to commit the offense. A conspiracy may be "unilateral," that is, one party who plans the underlying crime may still be guilty of conspiracy even if the other party does not act with the requisite culpable mental state but merely feigns agreement. State v. Marian
(1980), 62 Ohio St.2d 250, 405 N.E.2d 267, syllabus.
 {¶ 55} Furthermore, "[t]he offense of conspiracy is an agreement to accomplish a particular unlawful object, coupled with an overt act in furtherance thereof, whether remuneration is offered or not". State v.Lindsey (2000), 87 Ohio St.3d 479, 481, *Page 17 721 N.E.2d 995, reconsideration denied, 88 Ohio St.3d 1438, 724 N.E.2d 812, certiorari denied, 531 U.S. 838, 121 S.Ct. 99, 148 L.Ed.2d 58.
 {¶ 56} In this case the evidence at trial established that the appellant repeatedly discussed her intent to kill Brittany. Appellant's intense hatred for Brittany began in the fall of 2005 and was memorialized in a note which was confiscated by Principal Moore. By January of 2006, the appellant had begun to form a plan for murder and involved other students in implementing the plan.
 {¶ 57} On January 23, 2006, the appellant and Rachel entered into a verbal agreement to kill Brittany. Verbally, the girls agreed that on the morning on Friday, January 27, 2007, Rachel would give the appellant a key to her house. The appellant would then go to Rachel's house. Rachel agreed to pretend that she hated the appellant and lure Brittany to her house after school. The girls agreed that when they got to the house, appellant would be waiting to commit the murder. They further agreed to beat Brittany to death with a bat and bamboo sticks, cut up her body with daggers and distribute her body parts in two nearby ponds. Afterward the two girls were going to run away to either Florida or Michigan, until they were eighteen years of age. According to Rachel, "the plan was serious". (T.II. 78-80 and 84-86)
 {¶ 58} The girls then began exchanging notes regarding the murder plan. The notes were exchanged "hand-to-hand" between classes. (T.II. 93). The series of notes which ended in a final written plan were as follows:
 {¶ 59} After verbally agreeing to kill Brittany on January 27, 2006, Rachel wrote a note to appellant, stating that she would rather wait to kill Brittany until after her underage consumption court date in February and until appellant had her driver's *Page 18 
license. She stated that she didn't want to be incarcerated and she thought it would be easier to get away if the appellant could drive. (States Exhibit #3, T.II.86-88). She signed the note "P.S. We don't play the game, we run it. C.B.D.4".
 {¶ 60} Rachel subsequently learned that appellant intended to kill Brittany with or without her. She also learned that appellant had thought about killing Brittany earlier in the week rather than waiting until Friday afternoon. Rachel then wrote two notes to the appellant regarding her commitment to the murder. In the first of the two notes Rachel stated in pertinent part as follows:
 {¶ 61} "I'm not letting you go down alone. Even if I have to turn myself in . . . I want that skank dead. I['m] going to find a way even if it's not today. If we do kill her where are we going to go? We have no money, no car. No L's [driver's license]. But we ride together, we die together. I'm ready . . . I'm really ready. No guilt nothing ready? We going for good not a one weekend thing for good! I'm waiting just waiting for you to scream bounce! I love you. Love Rachel P.S. We don't play the game we run it!" (State's Exhibit #5, T.II. 93-95).
 {¶ 62} In a second note, Rachel wrote:
 {¶ 63} * * * "Please I'm not backing down. I'm just trying to make sure we don't get locked up. It will make things easier. I am helping you. Your not doing it without me. We have to make sure were good * * * I just don't want to see us get locked up and not get out for 30 years. * * * [signed] We don't play the game. We run it!"
 {¶ 64} On January 24, 2007, the appellant wrote two notes to Rachel. In the first note the appellant stated in pertinent part: *Page 19 
 {¶ 65} "* * *I hate school. Majorly. Theres already so much drama. And I shouldn't be involved with any of it. Except 4 this Brittany * * * thing. Cause she's mine. NO matter what I think that you should bring them bamboo sticks 2morrow. And I'm going to find out what bus she rides * * * and if Darren ever call this school phone 4 Brittany again, he's going to wish he never met me. * * * There's only a few goals I have right now.* * * 2. Merking Brittany * * * Rachel please help me. And w/out Brittany . . . He's (Darren) completely mine. 100%. That's all I want. NO joke * * * B! O! U! N! C! E! * * * P.S Call Darren 4me 2night. Tell him everything is fine * * * Don't say nothing about Brittany." (State's Exhibit No. 9, T.II. 107-108).
 {¶ 66} The second note set forth the details of the murder plan. The note was written to Rachel. The exchange of the detailed note occurred between appellant, Rachel and Chelsea in a special meeting in the bathroom at school. Appellant instructed the girls to read the note, remember the details, and flush it down the toilet. The note stated as follows:
 {¶ 67} "* * * I'm not going to spend one more night wondering if Darren is talking to her or not. I'm done. You make sure that no matter what Brittany Shaum goes to your house on Friday. No matter what. I don't care if you have to seriously pretend to hate me until Friday. Then on Friday morning I'm going to get a ride from school straight to your house. And Friday morning you are going to give me your house key. I'm going to be waiting in your room 4 when she gets there. I'm going to kill her or just beat her badly. Drag her out back of your house, kill her we'll cut her up or something. And each of us will take ½ of her. Dump the pieces randomly around. And no one will ever find her. We've got to make sure no one ever finds anything left of her. Burn the bamboo *Page 20 
stick and bury the knives. The only place Brittany * * * is going is hell * * * If I have to spend prison time she's gone.* * * I never thought I'd see myself murdering someone but it's for real this time." (State's Exhibit No. 10, T.II. 111-113.)
 {¶ 68} Subsequently, in response Rachel wrote:
 {¶ 69} "* * * I'll help you merk her and make sure you keep Darren. I'll call him tonight. See whats good. About the plan its good real good. But do it Friday. We need to save money * * * Also I have a perfect spot to lose her body * * * I'm done talking about this on paper. [Signed] We don't play the game! We run it. C.B.D.4 This is it!"
 {¶ 70} On January 25, 2006, the appellant wrote Rachel a note which stated, "I'm so excited about Friday! Seriously excited. Cause I have built up so much rage for her. So much. Her tomb stone is going to say: 9-29-89 to 1-27-06". (State's Exhibit No. 12, T.II. 119). That same day, Rachel made plans with Brittany to run away on Friday, she encouraged Brittany to bring her clothes to school so that they would only have to stop at Rachel's house before they left. (T.II.139.) Rachel also planned to dismember Brittany's dead body with two daggers she kept in her bedroom.(T.II.167 and 170).
 {¶ 71} During the adjudicatory hearing, Rachel, Chelsea, and Kayla all testified that they believed the appellant was serious and intended to complete the plan to murder Brittany.
 {¶ 72} The evidence presented at the adjudicatory hearing established a plan to commit murder which included the encouragement and solicitation of other students. The solicitation and encouragement transpired over several months. The plan was finalized in written form and exchanged with the other co-conspirator two days before the murder was scheduled to occur. On the day of the scheduled event, the appellant *Page 21 
appeared at school without a parent, Rachel had initiated the plan to lure Brittany to her home after school, and the daggers were ready at hand in Rachel's room. Furthermore, the co-conspirators knew how they were going to dispose of the body and flee to avoid criminal prosecution.
 {¶ 73} We find that these acts were committed in furtherance of the conspiracy, and were of a substantial and overt nature, in that they strongly corroborated the appellant's criminal purpose.
 {¶ 74} Therefore, we find that the trial court did not err in finding sufficient evidence to prove beyond a reasonable doubt that the appellant conspired to commit the murder of Brittany.
 {¶ 75} Accordingly appellant's second and third assignments of error are hereby overruled. IV {¶ 76} In the fourth assignment of error appellant argues that she was denied the effective assistance of counsel. Appellant argues that counsel was ineffective for failing to move to dismiss the facially invalid complaint; for conceding that the search of the appellant's purse was justified at the inception; and failing to object to the court's decisions overruling the suppression and determining that there was a substantial overt act in the furtherance of the conspiracy; and finally, failing to renew the motion to suppress after the assistant principal's testimony at trial. We disagree.
 {¶ 77} The Sixth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme *Page 22 
Court has generally interpreted this provision to mean that a criminal defendant is entitled to the "reasonably effective assistance" of counsel. Strickland v. Washington (1984), 466 U .S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674. In order to prove the ineffective assistance of counsel, a criminal defendant must show that (1) counsel's performance was in fact deficient, i.e., not reasonably competent, and (2) such deficiencies prejudice the defense so as to deprive the defendant of a fair trial. Strickland, 466 U.S. at 687, 80 L.Ed.2d at 693; State v.Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Failure to establish either element is fatal to the claim.Strickland, 466 U.S. at 687, 80 L.Ed.2d at 693.
 {¶ 78} When considering whether trial counsel's representation amounts to a deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. The United States Supreme Court has noted that "there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." United States v. Hasting (1983), 461 U.S. 499, 508-509,103 S.Ct. 1974, 76 L.Ed.2d 96.
 {¶ 79} The failure to object is not a per se indicator of ineffective assistance of counsel. Counsel may decide not to object for tactical reasons. State v. Gumm (1995), 73 Ohio St. 3d 413, 428, 653 N.E.2d 253. Debatable trial tactics and strategies do not constitute a denial of the effective assistance of counsel. State v. Clayton (1980),62 Ohio St. 2d 45, 49, 402 N.E.2d 1189. *Page 23 
 {¶ 80} As previously set forth in the first, second and third assignments of error, the complaint in this matter was not facially vague, the trial court's decision to overrule the motion to suppress was affirmed, and the inconsistency in the testimony of the principal and assistant principal did not substantially effect the court's determination as to whether the search of the appellant's purse was reasonable. For these reasons appellant has failed to establish that counsel's performance was either deficient or prejudicial.
 {¶ 81} Accordingly appellant's fourth assignment of error is hereby overruled.
 {¶ 82} The judgment of the Richland County Court of Common Pleas Juvenile Division is hereby affirmed. Edwards, J. Farmer, P.J. and Delaney, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Richland County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant.
[1] Darren was a 17 year old who did not attend Clearfork High School and resided in Mansfield, Ohio.
[2] Note from Rachel to appellant.
[3] The complete case citation for Terry v. Ohio was not provided in the quotation and is as follows: Terry v. Ohio (1968), 392 U.S. 1, 20,88 S. Ct. 1868, 1879. *Page 1