[Cite as *State v. Lockett*, 2013-Ohio-896.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.   12 CO 13 |
| | ) | |
| PLAINTIFF-APPELLANT, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| JOHN LOCKETT, III | ) | |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                                            Court, Case No. 10CR282.

JUDGMENT:                                        Reversed and Remanded.

APPEARANCES:
For Plaintiff-Appellee:                          Attorney Robert Herron
                                                            Prosecuting Attorney
                                                            Attorney Tammie Jones
                                                            Assistant Prosecuting Attorney
                                                            105 South Market Street
                                                            Lisbon, Ohio  44432

For Defendant-Appellant:                     Attorney Douglas King
                                                            91 West Taggart Street
                                                            P.O. Box 85
                                                            East Palestine, Ohio  44413

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

                                                            Dated:  March 8, 2013

VUKOVICH, J.

{¶1} The State of Ohio appeals the decision of the Columbiana County Common Pleas Court which granted the motion to suppress filed by defendant-appellee John Lockett, III. The state argues that there existed reasonable suspicion to detain the defendant for investigation into an altercation at a bar.

{¶2} The defendant urges that the entire case revolves around the trial court's credibility determination, which should not be disturbed. That is, the trial court believed the testimony that the witness slapped the defendant over the officer's testimony that the defendant slapped the witness.

{¶3} Although questions of credibility are for the trial court, the state was not required to show that the defendant actually hit the female. Rather, the state was merely required to establish reasonable suspicion that the defendant had engaged or was about to engage in criminal activity. Under the totality of the circumstances existing here, we conclude that the officer possessed reasonable articulable suspicion that appellant was involved in an altercation which needed to be investigated during a brief detention. Consequently, the trial court's suppression decision is reversed, and the case is remanded.

## STATEMENT OF THE CASE

{¶4} The defendant was indicted for illegal possession of a firearm in liquor permit premises, having a firearm while under a disability, and trafficking in marijuana. He filed a motion to suppress the firearm and the eleven bags of marijuana found on his person, arguing that there was no reasonable suspicion to detain him, thus no cause to frisk him, and thus no probable cause to thereafter arrest him for possession of the contraband. The threshold issue was thus whether there existed reasonable suspicion for an investigatory detention.

{¶5} At the suppression hearing, the state presented the testimony of two police officers, and the defense presented the testimony of three bar patrons. Officer Williams of the Wellsville Police Department testified that as a result of a call about a fight inside a bar, he was dispatched to the Platinum Bar at 1:33 a.m. on November 21, 2010. (Tr. 5-6). Upon arriving, he saw people leaving the bar to get away from

the fight. (Tr. 6). He entered the bar alone, and two other officers responded thereafter. (Tr. 6, 9).

{¶6} Officer Williams heard "several people screaming and hollering." (Tr. 6). He testified that he needed to clear out the bar, disclosing that "there were still attitudes" in the bar. (Tr. 8). He spoke with the person he knew who was working security at the bar and learned more about the incident. (Tr. 6-7). The trial court would not permit the officer to testify as to what he learned from security. (Tr. 7).

{¶7} Officer Williams then testified that while he was telling people to clear out, he saw the defendant slap a young female in the face. (Tr. 7, 9). The officer knew the defendant and the female. (Tr. 7-8). Officer Williams testified that he grabbed the defendant by the arm, handed him off to Officer Mancuso who was behind him, and instructed Officer Mancuso to take the defendant outside.

{¶8} At first Officer Williams testified that he said, "take him outside, he's under arrest." In the next sentence, however, Officer Williams amended his testimony to state: "To detain him and check him -- well basically to detain him, check him outside . He wasn't actually placed under arrest until he got outside." He then reiterated that he told Officer Mancuso to take the defendant outside to check him because he saw him assault the female and clarified that the incident that led to the arrest happened outside. (Tr. 9). He further explained that appellant needed to be detained pending the investigation into the assault. (Tr. 11-14).

{¶9} Officer Williams noted that he needed to stay inside the bar to ensure the problems were defused and to obtain information from the female in order to investigate the assault. (Tr. 11-12). He pointed out that there were still numerous people inside the bar and only three officers, causing him to believe that for their own personal safety, they needed to remove the defendant prior to dealing with him. (Tr. 12-13). He disclosed that charges for assault were never brought against the defendant because the female was uncooperative. (Tr. 14-16).

{¶10} To set the stage, Officer Williams explained that he had responded to another call about a fight at the Platinum Bar a half hour before this call. (Tr. 16). It was reported that one individual was assaulted by two or three other individuals.

Security also reported that another person was suspected to be carrying a firearm. (Tr. 17). The court originally sustained an objection with a request to strike the answer. The state argued that it went to the officer's state of mind, safety concerns, and the circumstances surrounding the establishment. (Tr. 17). The court voiced, "I understand the purpose. If you ask it that way I would probably allow it. Go ahead." (Tr. 17). As it was a bench hearing, the state did not repeat the line of questioning.

{¶11} The next witness to testify was Officer Mancuso. He had also responded to the first fight call at the bar that night where a gun was reported. Additionally, he had prior experience with fights and disruptions at that bar. He disclosed that patrons at that bar are known to carry guns and that he had reason to be concerned for his safety due to his experience with that bar. (Tr. 23).

{¶12} Officer Mancuso described what happened when he arrived at the bar the second time that night. As Officer Mancuso walked in the door of the bar, Officer Williams handed off the defendant (whom he knew) and advised that he had been involved in a fight. Officer Mancuso brought the defendant outside and instructed him to put his hands up against the wall. (Tr. 20). Officer Mancuso testified that he did not intend to arrest the defendant at that time. (Tr. 21). Rather, he intended to detain him for investigation, to conduct a pat down in order to ensure the subject was not carrying any weapons, and to then have the defendant take a seat to wait for Officer Williams to come out and advise him about the fight. (Tr. 20, 26).

{¶13} The defendant did not comply with the officer's request to place his hands on the wall. Instead, he took off running. Officer Mancuso chased him, twice told him that he would tase him if he did not stop, and then deployed his taser. (Tr. 21). In frisking the defendant thereafter, the officer discovered a firearm and eleven bags of marijuana on the defendant. (Tr. 22).

{¶14} The defense then presented the testimony of the female involved in the incident, Sena Williams. She testified that she has four children with the defendant but they were not dating at the time of the incident. (Tr. 28, 33). She disclosed that there had been physical violence between them in the past that resulted in court proceedings. (Tr. 33).

**{¶15}** On the night of the incident, she was out with her friends when she saw the defendant buying drinks for some females even though he had told her earlier that he could not help her with something she needed. (Tr. 29). She said she was so angry that (although she saw the officer by the door) she went up behind the defendant and hit him in the back of the head in a pushing motion.

**{¶16}** Ms. Williams testified that the defendant turned around, got out of his chair at the bar, and asked why she hit him. (Tr. 30, 41). Then, they argued back and forth. (Tr. 30, 35). She claimed that they were not screaming at each other, saying their voices were "just a little notch up" from talking. (Tr. 42). She acknowledged that the defendant was caught off guard and was not happy about being struck, but she denied that he struck her back. (Tr. 31, 35).

**{¶17}** Ms. Williams stated that the officer took the defendant away right after they started talking. (Tr. 30). She also testified that Officer Williams never approached her about the incident. (Tr. 37, 40). And, she said she was unaware that there had been an altercation at the bar prior to her striking the defendant. (Tr. 34). Although it was just after 1:30 a.m., she thought the police were there for closing time, which is at 2:30 a.m. (Tr. 36).

**{¶18}** Next, the defense presented the testimony of Ms. Zubay, whose friend was dating the defendant. She arrived at the bar between 11:00 p.m. and midnight, and the defendant was already there. She described the bar as packed and the defendant as "pretty drunk." (Tr. 55). She testified that Ms. Williams had been making statements to the defendant throughout the night. (Tr. 51, 56).

**{¶19}** Ms. Zubay explained that an unrelated fight broke out inside the bar causing her to look over to see if her friends were okay. (Tr. 50-51). She said people were yelling and described the scene as "craziness." (Tr. 59). She testified that when she looked over at her friends, she saw Ms. Williams hit the defendant in the back of the head, at which point the defendant turned around and the officer immediately took him away as if he were intervening so that the defendant would not have the chance hit her back. (Tr. 51-52). She said everything happened so fast and declared, "forgive me because I was drinking myself." (Tr. 60). She

acknowledged that she was across the room from the officer and that she observed the situation from a different angle than the officer did. (Tr. 60-61).

{¶20} Lastly, the defense called Ms. Edmundson, who had previously dated the defendant. She was under 21 so she did not drink at the bar, but she had drinks at home before arriving at the bar that night. (Tr. 68). She testified that from across the bar, she saw Ms. Williams approach the defendant and hit him. She said that the defendant did not retaliate in any way. (Tr. 64). She estimated that five minutes passed before the police arrived and escorted the defendant out of the bar. (Tr. 70-71). She did not notice the other fights occurring that night.

{¶21} The court then recalled Officer Williams who described his position in the bar. (Tr. 75). He said that he was concerned for his safety at the time. (Tr. 76-77). He explained that the maximum occupancy of the bar was 185 people, that this took place on the lower level, and there were probably 100 people on that level at the time. (Tr. 77). The officer clarified that he had not been looking directly at the defendant and Ms. Williams when the altercation began. He also stated that the defendant was standing when he struck Ms. Williams. (Tr. 76). He insisted that he briefly spoke to Ms. Williams on her way out to ascertain what had happened and that she refused to fill out a statement. (Tr. 78-80). He noted that he was almost immediately called outside because the defendant had started to run. (Tr. 79).

{¶22} Defense counsel argued to the trial court that if the officer really saw the defendant slap Ms. Williams, he would have filed an assault charge against him. (Tr. 81). The state emphasized that the essential question was whether it was appropriate to detain the defendant to determine what happened between him and Ms. Williams and argued that it is appropriate for an officer to separate parties to an altercation and interview them to ascertain what happened. (Tr. 83-85).

{¶23} On March 13, 2012, the trial court granted the defendant's motion to suppress. The trial court explained that Officer Mancuso had a right to rely on the information provided by Officer Williams in order to detain the defendant only if Officer Williams had reasonable suspicion of criminal activity. The trial court essentially found that the case turned on credibility. The court reviewed some of the

testimony, noted that the testimony of Ms. Williams was corroborated by two other witnesses, and thus adopted that version of events. From this, the court concluded that Officer Williams did not have reasonable suspicion of criminal activity in order to allow the detention. The state filed a timely notice of appeal with a Crim.R. 12(K) certification.

## ASSIGNMENT OF ERROR

**{¶24}** The state's sole assignment of error provides:

**{¶25}** "THE TRIAL COURT ERRED IN SUPPRESSING THE EVIDENCE AND HOLDING THAT THE SEARCH OF THE DEFENDANT'S PERSON WAS NOT BASED ON ANY REASONABLE, ARTICULABLE SUSPICION OR PROBABLE CAUSE."

**{¶26}** The state urges that officers have a reasonable suspicion to stop a person involved in a fight, even if it turns out that the person detained was the victim. The state notes that there is no dispute that there was a fight between the defendant and Ms. Williams and that at least one party slapped the other. The state posits that the trial court imposed too high of a standard by essentially requiring the prosecution to prove with certainty that the defendant hit the female, rather than applying the proper test requiring only that the officer have reasonable suspicion that appellant was involved in criminal activity which needed to be investigated. The state urges that it was not necessary for the prosecution to prove that the defendant actually assaulted the female in order to establish reasonable, articulable suspicion that criminal activity was afoot. The state concludes that there existed reasonable suspicion to detain the defendant pending an investigation into the fight.

**{¶27}** The defendant responds by pointing out that credibility determinations are for the trial court, citing to portions of Officer Williams' testimony that allegedly indicate a lack of credibility. The defendant insists that reasonable suspicion to detain and frisk him would only exist if he were the aggressor in the altercation. Because the trial court factually found that he was not the aggressor, the defendant urges that the detention and thus the frisk was per se unlawful.

**{¶28}** In reviewing a suppression decision, we are presented with mixed questions of law and fact. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. The factual findings are upheld if they are supported by competent, credible evidence. *Id.* Weight of the evidence and credibility of witnesses at the suppression hearing are issues that lie primarily in the province of the trial court. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Legal issues are then reviewed de novo without deference to the trial court. *Roberts*, 110 Ohio St.3d 71 at ¶ 100.

**{¶29}** A police officer can conduct a *Terry* stop to investigate a person if the officer has a reasonable suspicion that the person is involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). During such a detention, the officer can perform a brief frisk for weapons as a safety precaution if the officer has a reasonable suspicion that the person stopped may be armed and dangerous. *Id.* at 24, 27 (a reasonable prudent officer under the circumstances would be warranted in believing their safety or the safety of others is in danger).

**{¶30}** In evaluating reasonable suspicion, the investigating officer must have had before him specific, articulable facts that, when coupled with any rational inferences that may be drawn from those facts, warrant the investigation. *Id.* An inchoate hunch or unparticularized suspicion about criminal activity is not sufficient to justify a stop but probable cause is not required. *Terry*, 392 U.S. at 27. An officer need not artfully articulate his justification for the frisk as we view the evidence in the record regarding the specific facts the officer had before him. *State v. Whitfield*, 7th Dist. No. 99CA111 (Nov. 1, 2000).

**{¶31}** The reasonableness of a stop or a frisk is based upon the totality of the circumstances. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991). These circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold. *Id.* at 87-88 (considerations include the officer's experience, an area's reputation, the type of acts viewed, and the time of day). The officer can draw on his experiences and specialized training to make inferences and deductions about the cumulative

information he has perceived. *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (conduct relied upon need not be criminal itself).

**{¶32}** An officer need not shrug his shoulders at suspected crime merely because he lacks probable cause to arrest; rather a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be reasonable in light of the facts known to the officer at the time. *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), citing *Adams v. Williams*, 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

**{¶33}** Courts consistently hold that an officer has a duty to investigate reports concerning altercations and can stop individuals said to be involved in the fight. *See, e.g., State v. Hooghe*, 12th Dist. No. CA2005-03-032, 2005-Ohio-5620, ¶ 3 (officer stopped car said to be involved in bar fight); *State v. King*, 11th Dist. No. 2003-A-0018, 2004-Ohio-2598, ¶ 12-13 (officer can reasonably infer injured person was involved in fight that officer was dispatched to investigate and could order that person to his car); *State v. Mills*, 9th Dist. Nos. 02CA37-M, 02CA238-M, 2002-Ohio-7323 (officer drove by people who looked like they had just been in a fight and chased them after they ran from him); *State v. Wedding*, 12th Dist. No. CA99-04-032 (Oct. 25, 1999) (officer stopped car with belief occupants had been involved in domestic argument which generated calls to police); *City of Huber Heights v. McElwaine*, 2d Dist. No. 13459 (Mar. 24, 1993) (officer stopped car which bar employee said was involved in bar fight, and it turned out the "fight" was never physical). *City of Xenia v. Preston*, 2d Dist. No. 87-CA-102 (Nov. 29, 1988).

**{¶34}** Here, the officer was responding to a call that a fight was taking place inside the bar. He had responded to a similar call earlier. On both occasions, he spoke to a security guard at the bar whom he knew. The first time there was a fight involving two or more individuals against a single individual; there was also an allegation that another patron had a firearm. (Tr. 16-17). A mere half hour later, the officer was called back to the bar regarding another fight and was the first to respond

and enter. The department had prior experiences with fights and disruptions occurring at this bar as well. (Tr. 23).

**{¶35}** This officer had experience in law enforcement for nearly twenty years. (Tr. 5). The officer was concerned about his safety and expressed fear that someone would sneak up behind him. (Tr. 76-77). The second officer, with over five years on the force, confirmed that patrons of this bar were known to carry guns. (Tr. 23). Notably, the trial court found that the second officer's actions would have been justified if the first officer had reasonable suspicion of criminal activity.

**{¶36}** The bar was packed with 100 people on the lower level and more upstairs. (Tr. 55, 77). It was 1:30 a.m. Many of the bar patrons were intoxicated. The first responding officer heard people screaming and hollering and ascertained that there were still people in the bar causing trouble. (Tr. 6, 8). As he was assessing the situation and attempting to clear the bar, he noticed an altercation taking place.

**{¶37}** Although it may have been desirable to have more information about who called the police and what was said, what the officer previously knew about appellant, and what the security guard advised the officer during the second police response (the trial court would not allow the officer to answer the latter question), an officer need not artfully articulate his justification for the stop and frisk as long as there is evidence in the record regarding the specific facts the officer had before him. See *Whitfield*, 7th Dist. No. 99CA111.

**{¶38}** The officer believed the defendant slapped the female. By adopting the position set forth by the three female witnesses, the trial court essentially found that it was the female who hit appellant. Still, the defendant was involved in an altercation occurring in the middle of a post-bar-fight scene described by a defense witness as "craziness." (Tr. 59). The state was not required to prove that criminal activity by the defendant already took place but only that the officer had a reasonable suspicion that criminal activity was occurring or about to occur.

**{¶39}** Notably, everyone at issue had been drinking that night except the officers. Specifically, a witness for the defense described the defendant as being

"pretty drunk" and asked the court to forgive her own testimony because she had been drinking that night. (Tr. 55, 60). Ms. Williams admitted that she was so angry that she decided to hit the defendant in the head even though she saw a police officer standing by the door. As Ms. Williams testified, the defendant was obviously not happy about her hitting the back of his head, and he stood up from his barstool in order to confront and argue with her. (Tr. 30-31, 35, 41). Furthermore, the defendant's own witness posited that it seemed as though the officer quickly intervened so that the defendant could not hit Ms. Williams back. (Tr. 51-52). Thus, even if Ms. Williams had not yet been hit, there were indications that she was about to be.

{¶40} Moreover, there is no dispute that a physical altercation took place between the defendant and Ms. Williams at the tail end of a bar fight. The time of night, the location, the reputation of the bar, the "mood of the precinct", and the "circumambient activities" were very pertinent factors here. *See Freeman*, 64 Ohio St.3d at 295. The officer was faced with an obligation to respond to a call about a bar fight where he faced an unruly and large late-night bar crowd, at a bar with known violence problems, where certain patrons continued to act aggressively even though the police had arrived. The officer expressed justified fear for his safety during this time.

{¶41} Objectively, there thus existed more than an inchoate hunch or inarticulable suspicion that criminal activity was afoot. See *Terry*, 392 U.S. at 27. Thus, notwithstanding the fact that the officer's testimony about who hit whom was not the version of events adopted by the trial court, this does not necessarily mean that a detention was not warranted. Even if the officer was incorrect about who slapped whom, the officer had reasonable suspicion to justify detaining the defendant in order to investigate the altercation further, to protect himself from agitated patrons in the aftermath of a bar fight, and to determine if an arrest needed to be made.

{¶42} We conclude that the totality of the particular circumstances existing in this case allow a reasonable officer, who was responding to the myriad of events as they unfolded in the crowd he was hoping to disperse, to conduct an investigative

detention into this in-progress physical altercation in order to ascertain which participant (or whether a participant) should be arrested and while doing so conduct a brief frisk for weapons.   In accordance, the trial court's suppression decision is reversed, and this case remanded for further proceedings.

Donofrio, J., concurs.
Waite, J., concurs.