[Cite as *State v. Schuster*, 2017-Ohio-4115.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-05-097 |
| | : | O P I N I O N |
| - vs - | | 6/5/2017 |
| | : | |
| MICHELLE SCHUSTER, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2015-07-1098

Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Schreyer Thomas, LLP, H. Michele Thomas, 100 West Main Street, Eaton, Ohio 45320, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Michelle Schuster, appeals a decision of the Butler County Court of Common Pleas denying her motion to suppress. For the reasons detailed below, we affirm the decision of the trial court.

{¶ 2} On April 22, 2015, electrical work was being conducted near the intersection of Cox Road and Liberty Way in West Chester Township, Butler County, Ohio. At

approximately 3:23 p.m., a motor vehicle operated by appellant crossed multiple lanes of traffic and struck four electrical workers before crashing into an electrical truck. Appellant and the four electrical workers were transported to a nearby hospital. One of the electrical workers died from her injuries and the other three suffered serious physical harm. While at the hospital, a law enforcement officer had a registered nurse withdraw a blood sample from appellant. Testing of appellant's blood indicated that at the time of the accident she had alprazolam, or Xanax, and marijuana in her system.

{¶ 3} Appellant was indicted on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1), a felony of the second degree, one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2), a felony of the third degree, three counts of aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a), felonies of the third degree, three counts of vehicular assault in violation of R.C. 2903.08(A)(2)(b), felonies of the fourth degree, and one count of operating a vehicle while under the influence of a drug of abuse in violation of R.C. 4511.19(A)(1)(a), a misdemeanor of the first degree.

{¶ 4} Appellant pled not guilty to the charges. Appellant then moved to suppress, among other things, the blood-test results on the basis that the blood sample had not been taken voluntarily or in compliance with R.C. 4511.191 or Ohio Adm.Code 3701-53-01 through 3701-53-10.[1] A two-day hearing was held on appellant's motion, at which time the state presented testimony from three law enforcement officers employed by the West Chester Township Police Department, the nurse who withdrew appellant's blood sample, and two forensic toxicologists who tested appellant's blood sample.

{¶ 5} Officer Jeff Newman testified that at the time of the accident, he was working a

---

1. Appellant's motion also sought to suppress from evidence statements she made to law enforcement, physical evidence obtained by law enforcement, and "any observations and opinions of law enforcement" regarding her sobriety and alcohol level. As appellant's arguments on appeal only raise issues involving the blood sample taken at the hospital and the subsequent testing of the sample, we limit our discussion to the facts pertinent to such issues.

traffic detail at the intersection of Cox Road and Liberty Way. Newman had his back towards Cox Road when he heard a "loud boom." He turned and saw four electrical workers "moving in different direction through the air," one of the electrical trucks "shaking and moving," and the black car that had struck the side of the electrical truck spin around. Newman explained that although the black car had come to a stop, its engine was "racing at a real high speed" as if it was "being revved up by somebody."

{¶ 6} Upon approaching the black car, Newman saw appellant, the driver, slumped over "with her head off to the side." Newman attempted to talk to appellant, but she was incoherent and was fading "in and out of consciousness." While trying to speak with appellant, Newman noticed the smell of an alcoholic beverage coming from appellant's vehicle. Newman did not place appellant under arrest at this time.

{¶ 7} Officer Steven Seitzman testified that he arrived at the scene of the accident around 4:00 p.m. Upon his arrival, he was advised that appellant and the injured electrical workers had been transported to a nearby hospital. He was also advised that there was "an odor of an alcoholic beverage on the * * * at-fault driver."

{¶ 8} When Seitzman first arrived at West Chester Hospital's emergency room, the first thing he heard was "screaming and yelling" coming from appellant's room. According to Seitzman, the noise coming from appellant was "just incoherent screaming just as – as loud as you can imagine." Seitzman did not consider appellant's screaming and yelling to be speaking as "she wasn't speaking any sort of language [he] recognized."

{¶ 9} After checking on the electrical workers injured in the accident, Seitzman entered appellant's room and was advised by a nurse that appellant had needle marks on her hand. After observing appellant for a brief period of time, Seitzman requested that another officer bring a urine and blood collection kit to the hospital. Seitzman testified he requested the kit "based on a few factors," including "the air of alcohol [that] was described to [him] by

the officer that was at the scene," "the yelling and screaming" coming from appellant, which was "inconsistent with anybody else in the ER and highly unusual behavior," and the suspected needle marks on appellant's hand.

{¶ 10} Around 6:12 p.m., prior to appellant's blood being taken, Seitzman read appellant a BMV 2255 form, informing her of the consequences of refusing to submit to a blood test. Appellant was not placed under arrest at this time and she did not sign the form. Seitzman asked appellant if she wanted to comply with the blood test, and she responded with "incoherent yelling and screaming." Believing that appellant was unable, or incapable, of refusing to give consent, Seitzman opened the blood collection kit and handed two collection tubes to nurse Amanda Burton. Seitzman observed Burton open the tubes and draw appellant's blood before both he and Burton immediately sealed the tubes, signed the collected evidence, and sealed the evidence inside the collection kit. Within 15 minutes of the blood sample being drawn, Seitzman left the hospital with the sample and transported it to evidence-room refrigerator at the police station. Seitzman explained that the refrigerator is under the care and custody of the police department and is kept locked.

{¶ 11} Burton testified she was the emergency room registered nurse who helped treat appellant on the day of the accident. Burton testified appellant's words were "slurred" and "not comprehensible." According to Burton, appellant "never could answer any questions appropriately." Burton described appellant as "very combative and uncooperative," and noted that the hospital had to administer medication to calm her down. Although Burton could not specifically recall the name of the medication or medications provided to appellant, she knew the medication had been given to appellant prior to appellant's blood being drawn.

{¶ 12} Burton explained that at the request of law enforcement, she did a blood draw from appellant using "the material that [was] provided" in law enforcement's collection kit. Burton used the "site prep," tubes, specimen labels, and the nonalcoholic Betadine antiseptic

swab that came with the kit. She also used a sealed, dry, and sterile butterfly needle from the hospital in withdrawing appellant's blood. Burton testified that after filling both tubes from the kit with appellant's blood, she sealed and initialed the tubes before giving the collection kit containing the samples to Officer Seitzman.

{¶ 13} Officer Keith Staton testified he is the property room officer responsible for the safekeeping of evidence, including blood samples taken from a suspect. He explained that the refrigerators that store the collection kits containing blood samples are kept between the "high 30-degree range * * * up to about 41 degrees." If the refrigerator malfunctions and the temperature rises, an alarm goes off notifying him that the refrigerator needs repair. He stated that the refrigerator had not malfunctioned around the time that he received appellant's blood sample.

{¶ 14} Staton explained that on April 24, 2015, he transported appellant's blood collection kit to the Miami Valley Regional Crime Lab ("MVRCL"). The kit was stored in a cooler placed inside the trunk of Staton's vehicle. It took Staton approximately 45 minutes to get to MVRCL, and upon his arrival, he gave custody of the kit to Lori Chenoweth, an MVRCL employee.

{¶ 15} Phillip Carter and Elizabeth Kiely, forensic toxicologists employed by MVRCL, testified about various tests they ran on appellant's blood sample. Carter explained that he retrieved appellant's blood collection kit frim the lab's main refrigerator and transported it upstairs to the toxicology section's refrigerator, where appellant's blood sample was stored until testing was completed. Carter conducted a blood alcohol test on appellant's blood sample using gas chromatography on May 4, 2015. On May 5, 2015, he conducted an ELISA drug screen, or an immunoassay screening technique, that tests for different classes of drugs. Based on the results of the ELISA testing, Carter also performed a confirmation test for the presence of marijuana.

{¶ 16} Kiely testified that on May 8, 2015, she conducted a gas chromatograph mass spectrometer ("GCS") basic drug screening of appellant's blood after obtaining the sample from the lab's refrigerator. Kiely stated she believed the blood sample contained anticoagulant as the red blood cells had not separated from the plasma and clumped together in the collection tubes. Kiely explained the GCS drug test "looks for a wider variety of drugs than [the] ELISA screen," such as prescription medications. After performing the GCS testing, Kiely also conducted an opiate confirmation test and a benzodiazepine confirmation test. Kiely's testing revealed the presence of alprazolam, commonly known as Xanax, in appellant's blood.

{¶ 17} Following Kiely's testimony, the trial court accepted into evidence the following exhibits introduced by the state: the BMV 2255 form read to appellant, photographs of the blood collection kit, appellant's signed waiver of her *Miranda* rights, the police department's property room report for appellant's blood collection kit, Carter's and Kiely's curricula vitae, and permits issued by the Ohio Department of Health to Carter and Kiely authorizing them to perform alcohol and drug testing. Appellant did not present any testimony or exhibits in support of her motion to suppress.

{¶ 18} The trial court denied appellant's motion after concluding that appellant's blood had been taken in accordance with R.C. 4511.191(A)(4) and that the state had substantially complied with Ohio Adm.Code 3701-53-01 through 3701-53-10 in collecting, transporting, and testing appellant's blood. The court found that Officer Seitzman "had probable cause to believe that the [appellant] may have been operating a motor vehicle while under the influence of alcohol o[r] drugs of abuse" in violation of R.C. 4511.19, and he had "reasonable cause and probable cause to request and demand a blood sample from the [appellant]." The court further found that appellant "impliedly consented under the circumstances of this case to a blood draw" as she was "incapable of refusal by virtue of the fact she was unresponsive

* * * [and] was yelling and not responding to questions or commands. * * * [Appellant] was incapable of communication – incapable from all the testimony * * * of hearing, receiving, processing * * * information and therefore, incapable of refusal."

{¶ 19} A five-day jury trial commenced on April 4, 2016. The jury found appellant guilty of one count of aggravated vehicular homicide, one count of negligent homicide, three counts of aggravated vehicular assault, and one count of operating a motor vehicle under the influence. The negligent homicide conviction was merged with the aggravated vehicular homicide conviction, and appellant was sentenced to an aggregate prison term of 16 years.

{¶ 20} Appellant timely appealed, raising the following as her sole assignment of error:

{¶ 21} THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS.

{¶ 22} Appellant contends the trial court erred by denying her motion to suppress for two reasons. First, appellant argues that the blood sample was taken "contrary to the requirements set forth in ORC 4511.19, and the tests to determine [her] alcohol or drug level were not taken voluntarily and were unconstitutional." Second, she argues the "collection, transport, and testing of [her] blood * * * was not done in substantial compliance with the Ohio Administrative Code."

{¶ 23} Our review of a trial court's denial of a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently

reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 24} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, ¶ 15. "[A] warrantless search of the person is reasonable only if it falls within a recognized exception." *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552, 1558 (2013). The burden is on the state to establish that the warrantless search was constitutionally permissible. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 98.

{¶ 25} R.C. 4511.19(D)(1)(b) provides that "[i]n any criminal prosecution * * * for a violation of division (A) or (B) of this section or for an equivalent offense that is vehicle-related, * * * [t]he court may admit evidence on the concentration of alcohol, drugs of abuse, or a combination of them * * * when a person submits to a blood * * * test at the request of a law enforcement officer under section 4511.191 of the Revised Code or a blood * * * sample is obtained pursuant to a search warrant."[2]

{¶ 26} Pursuant to Ohio's implied-consent statute, R.C. 4511.191, "[a]ny person who operates a vehicle * * * upon a highway or any public or private property used by the public for vehicular travel * * * shall be deemed to have given consent to a chemical test or tests of the person's whole blood, blood serum or plasma * * * to determine the alcohol, drug of abuse, controlled substance, metabolite of a controlled substance, or combination content of the person's whole blood, blood serum or plasma * * * if arrested for a violation of division (A)

---

2. In addition to facing criminal prosecution for driving under the influence in violation of R.C. 4511.19(A)(1)(a), appellant also faced prosecution for the vehicle-related "equivalent offenses" of aggravated vehicular homicide and aggravated vehicular assault, as defined in R.C. 4511.181(A)(4) and (5).

or (B) of section 4511.19 of the Revised Code." R.C. 4511.191(A)(2). The statute further provides that "[a]ny person who is dead or unconscious, *or who otherwise is in a condition rendering the person incapable of refusal*, shall be deemed to have consented as provided in division (A)(2) of this section, and the test or tests may be administered, subject to sections 313.12 to 313.16 of the Revised Code." (Emphasis added.) R.C. 4511.191(A)(4).

{¶ 27} Appellant argues the implied consent statute does not apply as she had not been arrested at the time the blood sample was taken. She further argues that because she was not "dead or unconscious," the implied consent statute had not been "triggered."

{¶ 28} This court previously considered the implied consent statute as it pertained to a blood sample taken from an unconscious individual who was not under arrest at the time the sample was taken. *See State v. Taylor*, 2 Ohio App.3d 394 (12th Dist.1982). There, we read the implied consent statute "to authorize the withdrawal of blood from an unconscious individual by an officer who has reasonable grounds to believe the person * * * ha[d] been driving a motor vehicle upon the public highways of this state while under the influence of alcohol, whether or not the unconscious person [was] actually placed under arrest." *Id.* at 395. In arriving at this decision, we noted that

> [a] police officer in such a case as this is in a difficult position. Certainly he is concerned that the unconscious individual receive prompt medical attention. On the other hand, he has an obligation to enforce the law prohibiting driving while intoxicated. Therefore, the officer must get a blood test quickly while leaving the unconscious individual in the control of the hospital authorities in order to accomplish both goals. We do not think that the legislature intended to prohibit this procedure by requiring an arrest of an unconscious person.

*Id.*

{¶ 29} The same rationale applies to a person who is in a condition rendering her incapable of refusal. We therefore hold that at the request of law enforcement, R.C. 4511.191(A)(4) authorizes the withdrawal of a blood sample from an individual in a condition

rendering her incapable of refusal if the officer has reasonable grounds to believe the individual has been driving a motor vehicle upon the public highways of this state while under the influence of alcohol or drugs of abuse, regardless of whether the person is actually placed under arrest. *Accord State v. Hayes*, 2d Dist. Montgomery No. 26379, 2016-Ohio-7241, ¶ 47 ("R.C. 4511.191[A][4] specifically deems an unconscious or incapacitated person to have consented to a blood test if there is probable cause to believe the person has been operating a motor vehicle while intoxicated").

{¶ 30} In the present case, Officer Seitzman had reasonable grounds and probable cause to believe that appellant had been operating a motor vehicle while under the influence. Probable cause, within the context of arrests for driving under the influence, is determined by looking at whether the officer "had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, to cause a prudent person to believe the accused was driving under the influence." *State v. Henriksson*, 12th Dist. Butler No. CA2010-08-197, 2011-Ohio-1632, ¶ 11. Probable cause is determined by looking at the totality of the surrounding circumstances." *Id.*; *Hayes* at ¶ 51.

{¶ 31} At the time Seitzman had appellant's blood sample taken, the totality of the circumstances was sufficient to warrant a prudent person to believe that appellant had been driving under the influence. Seitzman had observed the scene of the accident and had been advised that appellant had crossed over multiple lanes of traffic before striking the electrical truck. He had been informed that there had been an odor of an alcoholic beverage either about appellant's person or coming from her vehicle. Upon arriving at the hospital, Seitzman observed appellant's "highly unusual behavior" of incomprehensibly yelling and screaming, and was advised that appellant had needle marks on her hand. Taking all of these facts into consideration, the totality of the circumstances supports the trial court's finding that probable cause existed to believe that appellant had been driving under the influence at the time of the

accident.

{¶ 32} The record also supports the trial court's finding that appellant impliedly consented to the blood draw pursuant to R.C. 4511.191(A)(4) by being in a condition rendering her incapable of refusal. Officer Newman testified that immediately after the accident appellant was going in and out of consciousness and was incoherent. Officer Seitzman testified appellant was not "speaking any sort of language" at the hospital but was "incoherent[ly] yelling and screaming." Nurse Burton corroborated Seitzman's observations, testifying that appellant's words were "not comprehensible" and that appellant "never could answer any questions appropriately." As there was competent, credible evidence to support the trial court's finding that appellant was "incapable of communication – incapable * * * of hearing, receiving, and processing information and therefore, incapable of refusal," we find no error in the trial court's decision not to suppress the blood-test results on the basis that there was probable cause and implied consent pursuant to R.C. 4511.191(A)(4) for the blood sample to be taken.

{¶ 33} Appellant also contends the state failed to demonstrate it substantially complied with the Ohio Administrative Code in collecting, transporting, and testing her blood sample. Appellant does not identify any specific regulation or regulations the state allegedly failed to comply with, but rather argues that the "test results were contaminated by the medications [she] was administered in the emergency room during treatment."

{¶ 34} The Director of Health promulgated certain regulations in Ohio Adm.Code 3701-53-01 through 3701-53-10 for testing the concentration of alcohol or drugs of abuse found in an individual's blood, breath, or urine. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 9-10; *State v. Zink*, 9th Dist. Summit No. 17484, 1996 Ohio App. LEXIS 3836, * 5, fn. 1 (Sept. 4, 1996). When a defendant challenges the validity of a blood test by way of a pretrial motion to suppress, "the state has the burden to show that the test was administered

- 11 -

in substantial compliance with the regulations prescribed by the Director of Health" to trigger the presumption of admissibility. *Burnside* at ¶ 24, 27. The substantial-compliance standard excuses "only errors that are clearly de minimis" or are "'minor procedural deviations.'" *Id.* at ¶ 34, quoting *State v. Homan*, 89 Ohio St.3d 421, 426 (2000). "Once the state has satisfied this burden and created a presumption of admissibility, the burden then shifts to the defendant to rebut that presumption by demonstrating that [s]he was prejudiced by anything less than strict compliance." *Id.* at ¶ 24.

{¶ 35} In the present case, the state demonstrated substantial compliance with Ohio Adm.Code 3701-53-01 through 3701-53-10 through the testimony of officers Seitzman and Staton, nurse Burton, and toxicologists Carter and Kiely. Burton and Seitzman's testimony indicated that a nonalcoholic Betadine antiseptic swab had been used on appellant's skin before a sterile, dry needle was used to withdraw blood into two tubes, which according to Kiely, contained an anticoagulant. The tubes contained labels with the date and time of collection, appellant's name, and the initials of Seitzman and Burton. Seitzman and Staton's testimony demonstrated that the blood samples were kept refrigerated and secured in police custody until such time as they were transported to MVRCL. Carter and Kiely testified about MVRCL's facility requirements as well as their individual training and experience. Permits issued to Carter and Kiely by the Ohio Department of Health were introduced into evidence, demonstrating that they had been authorized to perform alcohol and drug testing using certain analytical techniques or methods, including gas chromatography, mass spectroscopy, and immunoassay screening techniques. They explained that they tested appellant's blood sample using these specific techniques and methods.

{¶ 36} Despite the evidence demonstrating the state complied with the requirements of Ohio Adm.Code 3701-53-01 through 3701-53-10, appellant nonetheless maintains that the test results from her blood sample should have been suppressed because the sample was

"contaminated" by medications administered at the hospital. She argues that the "[f]ailure to consider blood contamination through no fault of [her own] * * * prior to collection [is] an egregious mistake, holding [her] potentially criminally responsible for substances in her blood over which she had no control." However, nothing in Ohio Adm.Code 3701-53-01 through 3701-53-10 prohibits a blood sample from being taken or tested merely because medication has been administered to treat a suspect who is receiving medical care in an emergency situation. While the type and amount of medication a hospital has administered would certainly be admissible and relevant evidence in determining a defendant's guilt, it has no bearing on the collection, transporting, or testing of the sample as regulated by Ohio Adm.Code 3701-53-01 through 3701-53-10.

{¶ 37} Moreover, in the present case, appellant did not preserve the issue of whether the medication given to her at the hospital contaminated the sample or affected the state's compliance with the regulations set forth in Ohio Adm.Code 3701-53-01 through 3701-53-10. Appellant's November 18, 2015 motion to suppress did not raise this specific issue. At the hearing on the motion to suppress, Burton did testify that medication was given to appellant prior to the blood sample being taken in order to calm appellant. However, Burton could not recall what medications were administered. During arguments on the motion, defense counsel initially attempted to argue that the blood sample was contaminated and should be suppressed, but ultimately conceded that "there's not evidence as to what was given to [appellant]." Defense counsel requested that the court "leave the matter open, [as] obviously the implied consent aspect doesn't address that – or the warrant issue doesn't address that specifically." The trial court complied with defense counsel's request, stating that with respect to the possible contamination of the sample by medications administered at the hospital, it would "allow the Defendant to preserve that aspect of the motion to suppress to refile that. * * * [The court] will allow you to preserve or refile that motion to suppress based

on that argument.  * * *  [T]he Court is giving opportunities to full[y] vet that issue; to make that motion."

{¶ 38}   However, defense counsel did not file with the trial court a supplemental motion to suppress raising this issue.  The issue, therefore, was not preserved and has been waived for purposes of appeal.  *See State v. Davis*, 12th Dist. Clinton No. CA2015-12-022, 2017-Oho-495, ¶ 75.

{¶ 39}   Accordingly, as there was probable cause for the blood sample to be taken, appellant impliedly consented to withdrawal of the sample in accordance with R.C. 4511.191(A)(4), and the state substantially complied with the regulations set forth in Ohio Adm.Code 3701-53-01 through 3701-53-10 in collecting, transporting, and testing appellant's blood sample, we find that the trial court did not err in denying appellant's motion to suppress.  Appellant's sole assignment of error is overruled.

{¶ 40}   Judgment affirmed.


RINGLAND and PIPER, JJ., concur.